Filed 10/31/22 P. v. Carranco CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAVIER CARRANCO, JR. et al.,<br><br>Defendants and Appellants. | F080706 & F080779<br><br>(Super. Ct. Nos. DF013443A & DF013443B)<br><br>**OPINION** |

APPEALS from a judgment of the Superior Court of Kern County. Kenneth C. Twisselman II, Judge.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant Javier Carranco, Jr.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant Miguel Valencia Madrigal.

Matthew Rodriquez, Acting Attorney General, Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Brook A. Bennigson and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

This is a consolidated appeal brought by Javier Carranco, Jr., and Miguel Valencia Madrigal (defendants) in relation to two shootings occurring within approximately an hour of each other. First, a motorist was having car trouble when a car passed by and stopped in the street in front of him. The front seat passenger of the passing car fired multiple shots in the motorist's direction; the motorist was not injured. Shortly thereafter, a few miles away, gunshots were fired into a house with multiple people inside. Police apprehended defendants in a nearby car after they attempted to flee when the police tried to stop them. The police found an AK-47 style assault rifle and a revolver in the car. The rifle was warm to the touch and forensic analysis revealed the shell casings of the rifle's bullets matched the casings found at the house where the drive-by shooting occurred.

In connection with the shootings, a jury convicted both defendants of multiple counts of assault with a firearm, discharge of a firearm at an inhabited dwelling, gang conspiracy,[1] recklessly evading a pursuing officer in a motor vehicle, possession of an assault weapon, carrying a loaded firearm as a gang member, and active participation in a criminal street gang. Madrigal was also convicted of being a felon in possession of a firearm. The jury found true the related gang and firearm enhancements attached to the discharge of a firearm at an inhabited dwelling counts, the assault with a firearm counts, the gang conspiracy counts, the possession of an assault weapon counts, and the felon in possession of a firearm count. The jury found not true the alleged gang and firearm enhancements attached to the assault with a firearm count against the motorist and the reckless evasion of a pursuing officer in a motor vehicle count. The jury also found true allegations Madrigal had suffered one prison prior, one strike prior, and one serious felony prior.

---

[1]The court subsequently dismissed defendants' gang conspiracy convictions.

On appeal, defendants jointly challenge their convictions for assault with a firearm of the motorist, asserting the evidence was insufficient to support their convictions. They also assert the court prejudicially erred in excluding evidence of third party culpability and in permitting the prosecution's expert to testify regarding details of the Norteño gang on which he was not an expert. They further allege the prosecutor engaged in prejudicial misconduct, and the cumulative effect of the court's errors requires reversal. Finally, in supplemental briefing, defendants assert, and the People agree, they are entitled to reversal of their convictions for carrying a loaded firearm as a gang member and active participation in a criminal street gang, their gang enhancements, and the gang-related firearm enhancements as a result of the passage of Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333). They also contend, pursuant to newly enacted Penal Code section 1109, they are entitled to reversal of all of their substantive convictions based on the court's failure to bifurcate the gang allegations. (Undesignated statutory references are to the Penal Code.)

We reverse defendants' convictions for carrying a loaded firearm as a gang member (§ 25850, subd. (c)(3)) and active participation in a criminal street gang (§ 186.22, subd. (a)), their gang enhancements (§ 186.22, subd. (b)), and the gang-related firearm enhancements (§§ 12021.5, 12021.5, subd. (b)) based on the passage of Assembly Bill 333 and remand for further proceedings consistent with this opinion. In all other respects, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendants were charged with multiple counts related to two shootings occurring on April 4, 2018.

### *The first shooting on April 4, 2018*

On April 4, 2018, at 2:30 a.m., Francisco B. was driving his car in Delano when he started having engine and bumper problems. He pulled over at a corner liquor store because the car was not working properly. He tried to fix it, restarted the car, and began

to drive away. As he was driving on a two-lane road, a light grayish-blue car pulled up alongside Francisco B.'s car. Francisco B. identified the light grayish-blue car in surveillance video footage played at trial and testified he believed it to be a Grand Marquis. There were three Hispanic males inside.[2] The front passenger pointed a gun out of the car's window at Francisco B. and said, "'What's up, Ene?'" two to three times.[3] Francisco B. understood the phrase to be "gang-related"; he repeatedly responded he was a "paisa" and did not "gang-bang." The occupants of the other car laughed and drove off past Francisco B. Francisco B. testified he had never belonged to a criminal street gang.

Francisco B.'s car stalled, causing him to stop; he saw the Grand Marquis 100 feet ahead do a half U-turn, blocking the two-lane road. Francisco B. stayed in the car and watched the Grand Marquis.[4] He testified the front passenger of the Grand Marquis got out and started shooting a black handgun at Francisco B. Francisco B. testified the gun was a revolver. The shooter fired three or four times in Francisco B.'s direction. Francisco B. was not hit, but the shots hit his car. Francisco B. managed to start his car. He reversed and drove away.

Francisco B. described the shooter as "big-boned," "stocky," with a mustache and facial hair in the chin area, short—between five feet four inches and five feet eight inches in height—and with hair on his head, meaning "not bald." He testified the back seat passenger was bald.

---

[2]At trial, Francisco B. was confronted with an earlier statement he made to police on the day of the incident in which he said there were two, possibly three, people in the Grand Marquis. He stated there were three people in the car in his 911 call.

[3]Francisco B. testified, initially, he did not tell the police the front passenger pointed a gun at him and asked, "'What's up, Ene?'" He reported it later.

[4]Francisco B. acknowledged he previously told police he was outside of the car at the time of the shooting.

*The second shooting on April 4, 2018*

L.G. lived on College Drive with her son V.G., her two minor granddaughters, her ex-husband, her cousin, her cousin's boyfriend, and her nephew. L.G. has three other sons, Daniel L., Juan C., and Jose L.; she testified she did not believe any of them were involved with gangs. However, she later testified she knew Juan C. to be a Norteño. She denied telling the police her son Daniel L. was a Norteño dropout.

During the early morning hours of April 4, 2018, everyone in L.G.'s house was sleeping when multiple gunshots were rapidly fired at the house, garage, and cars. None of the occupants of the house were injured. V.G. called 911, and the police eventually arrived.

Officers Brianna Dixon and Michael Strand were responding to the call, but, on the way, they heard a broadcast regarding a vehicle pursuit, which they joined. After the pursuit ended, Officers Dixon and Strand participated in a felony stop, also known as a high-risk traffic stop. Once the occupants of the fleeing car were taken into custody, Officers Dixon and Strand went back to the College Drive house and observed the bullet holes in it and the vehicles parked outside. They found spent shell casings in the driveway area and yard, which Officer Dixon collected and booked into evidence. She took statements from L.G., L.G's ex-husband, her nephew, and V.G.

L.G. informed Officer Dixon that L.G.'s son, Daniel L., had been living at the residence as of the prior Friday, March 30, 2018, but he had moved out and was not living there at the time of the shooting.

*Apprehension of defendants and subsequent investigation*

Officer Mark Morales met with Francisco B. at 3:02 a.m. at Francisco B.'s residence on the day of the incident and took a statement from him. Francisco B. reported to Officer Morales he saw a Grand Marquis in the left-turn lane as he turned right onto Albany Street. He stated there were three, male, Hispanic occupants in the Grand Marquis. Francisco B. then got out of his car to fix his bumper and he saw the

Grand Marquis go past him and make a U-turn to face him. The front passenger got out and asked Francisco B., "What's up, N. [*sic*]." The front passenger then pulled out a black revolver. Francisco B. put his hands up and heard four to five shots; he moved away from his vehicle to avoid the shots. Francisco B. described the shooter as a chubby, five-foot seven-inch, Hispanic male with short hair or balding, and with a goatee. He stated the driver was also Hispanic and appeared to be thinner than the shooter.

At approximately 3:30 a.m., as Officer Morales was searching for other evidence, he heard a dispatch call over the radio saying that shots were fired at another address. Officer Morales got in his car and headed toward that address. As he was driving, around 3:31 a.m., he saw what he believed to be a silver Grand Marquis with two occupants go past him in the opposite direction heading towards the freeway. Officer Morales made a U-turn and began following the silver car. The traffic was light at the time, meaning there were very few cars on the road. Officer Morales reported over dispatch he was in pursuit of the car, and he provided the car's license plate number. As Officer Morales continued following the silver car, the silver car "took off at a high rate of speed, faster than [Morales] was going," more than 80 miles per hour. Officer Morales then activated his overhead lights and siren. In response, the silver car continued speeding up and got off the freeway and then back on. Officer Morales continued to follow the car, which failed to yield. The car exited the freeway again and sped through streets, dirt roads, and between fields and orchards. It "blew through" a stop sign and turned off its lights. Eventually, it stopped on its own accord in between a field on a dirt road. Officer Morales and his partner exited their car and instructed the driver of the silver car to throw the keys out of the window; the driver complied. Another officer arrived and conducted a "felony car stop," meaning he had the driver exit the car with his hands up and turn around so the officers could see his waistband.

At trial, Officer Morales identified Carranco as the driver of the car and Madrigal as the front seat passenger. Officer Morales documented both defendants appeared to be

6.

under the influence of alcohol. The officers searched the car and discovered two firearms inside. Officer Morales handled an AK-47 style rifle (later specifically identified as a Norinco MAK-90) that was found on the car's floorboard; he testified the barrel was "warm to the touch." Based on his experience with firearms, Officer Morales opined it appeared the assault weapon had been recently fired. He noticed there were no rounds in the chamber of the gun or the magazine. He explained, after a firearm is fired, it becomes warm or "hot due to friction." He also inspected a black revolver found in the car. It was cold, not loaded, and there were no spent shell casings inside.

Officer Morales believed the car he pursued was a Grand Marquis at the time, but it was actually a Crown Victoria. He testified that he was familiar with both cars and they looked similar.

Two days after the shootings, Officer Dixon received a message from L.G., so Officers Dixon and Strand went to L.G.'s house to meet with her. L.G. said she feared retaliation because she believed the shooting may have been gang related. L.G. reported her son, Juan C., was a Norteño and her other son, Daniel L., was a dropout. Officer Dixon documented the contact in a report.

On April 6, 2018, Officer Darian Santaella, who was assigned to the gang unit, tried to contact L.G. at her home, but he did not get a response. While there, Officer Santaella noticed "what appeared to be a projectile fragment located in the driveway"; he took the item and booked it into evidence.

On May 3, 2018, Officer Santaella contacted Carranco and obtained a DNA sample from him pursuant to a search warrant. On May 8, 2018, Officer Santaella obtained a DNA sample from Madrigal. The DNA samples were compared to the DNA profile developed from biological evidence collected from the revolver, the rifle magazine, and the rifle retrieved from defendants' car on April 4, 2018.

With regard to the mixed DNA profile obtained from the revolver, Carranco could not be excluded as a potential contributor. Put differently, "a match between the

swabbing from the revolver and Javier Carranco is 15,000 times more likely than a coincidental match to a random, unrelated person from the population." With regard to the DNA profile taken from the biological stain swabbing of the rifle, "there was not enough statistical support to draw a conclusion as to whether or not Javier Carranco could be excluded as a potential contributor to the profile," meaning the results were not clear to render a conclusion one way or the other. With regard to the magazine of the rifle, the DNA profile was a mixture, but Carranco could be excluded as a potential contributor. The results were inconclusive when comparing the DNA profiles obtained from the revolver and rifle to Madrigal's DNA sample. Madrigal could be excluded as a contributor to the sample obtained from the rifle magazine.

A firearms analyst explained the process for determining whether a shell casing was fired from a particular firearm, including reviewing "class characteristics." She reviewed six spent PMC brand 7.62- by 39-millimeter cartridge cases and one copper jacket fragment obtained from the scene of the College Drive shooting. She compared the "evidence" cartridge cases to "test fires" she did from the rifle obtained from the Crown Victoria in which defendants were apprehended. She viewed them side by side in a comparison microscope to compare their individual characteristics. With regard to the six cartridge casings retrieved from the College Drive residence, she opined "all six cartridge cases were fired by the same firearm." Additionally, based on her examination of all the different areas, she opined the "evidence cartridge case" was fired by the same firearm as the "test-fires." She specifically opined, based upon her training and experience, that all six shell casings submitted for evaluation were fired from the "Norinco, MAK-90, AK-47 style rifle." She explained the similarities between the cartridge cases. She was unable to do a comparison with the copper jacket fragment because it was "too badly damaged."

*Carranco's prior contacts with police*

On September 13, 2015, Officer Strand took photographs of Carranco during an encounter with him in Delano. Officer Strand explained the significance of Carranco's clothing at the time. Carranco was wearing a hat with a D on it, which Strand testified stood for Delano, noting "gang members in Delano are territorial and like to claim where they are from in part through their clothing." Carranco was also wearing red shorts and his shoes had red trim, which "is the color of the Norteño gang." He noted Carranco has an "NKC" tattoo on his left shin to refer to North Kern County, which "is a significant gang tattoo." The tattoo was also significant because it was red. Carranco also had a tattoo on his left upper arm of the Mayan symbol for the number 14, which is significant for the Norteño gang because N is the 14th letter of the alphabet. He noted Delano is primarily a "Norteño city." Carranco also had tattoos of "CA," "RIP Cruz," "SF," four dots on his elbow, and four dots on the knuckles of one hand and one dot on the other.

After being dispatched to a residence on July 19, 2014, police officers encountered Carranco with Jerman Perez, Saul Vaca, and Cruz Martinez in a nearby vehicle. Vaca had tattoos of four dots on one arm, and one dot on the other. He also had an "N" and "NKC" tattooed on his arms. Officer Santaella opined Vaca was an active gang member of the Norteños at the time.

*Madrigal's prior police contacts*

Delano police officers responded to a possible burglary in progress on November 20, 2006. They detained and arrested Madrigal, who was wearing a "red checkered patterned shirt," and Jesus Alaniz Mendez, who was found in the rear bedroom of the residence. After being advised of his *Miranda* rights, Madrigal told the officers he was visiting a friend at that house, and he needed to get back home. So, "he asked a male subject … who was riding past the residence if he could loan him the bike, and the male did so." Madrigal stated he did not know the man he stopped. Madrigal said he ran from police despite being asked to stop repeatedly because "he had been arrested for grand

9.

theft auto a few days prior and the charges were dropped but [he] was warned by the Judge that the charges would be back in effect if he were arrested for any other violation." Madrigal admitted he was a member of the Norteños in the "North Kern County clique."

Officer Santaella testified Alaniz was convicted of attempted second degree robbery with a gang enhancement in connection with the incident (§§ 664, 212.5, subd. (c)). Madrigal pled guilty to attempted second degree robbery (§§ 664, 212.5, subd. (c)). Based upon his knowledge of the case, the crimes of which Alaniz and Madrigal were convicted, the location of the incident, and his training and experience, Officer Santaella opined Alaniz and Madrigal were active members of the Northern criminal street gang on the date of the crime. He explained it was significant Madrigal and Alaniz committed the crimes together because "[t]hey were associating together." He testified it was very common to see multiple Norteños working together to commit crimes.

### Gang expert testimony

Officer Santaella opined, based on his contact with members of the Norteño criminal street gang, his discussions with other law enforcement officers, dropout Norteño gang members, members of the community, and his review of the offenses discussed at trial, that the Norteños were engaged in an ongoing pattern of criminal activity that was common knowledge to active Norteños and community members. He testified the Norteños were active on April 4, 2018.

Officer Santaella was familiar with Carranco based upon his personal contacts with him, his review of police reports involving Carranco, and speaking with officers who had contact with Carranco. He testified to Carranco's tattoos, and the prosecution introduced pictures of them. Carranco had a tattoo of an "X" denoting the number 10 on his left rear triceps area and another of the number "4," totaling 14. Carranco also had one dot on his right elbow, four dots on his left elbow; the Mayan symbol for the number 14 consisting of two horizontal lines and four dots on his left arm; one dot on the middle

10.

knuckle of his right hand and four dots on the knuckles of his left hand; a tattoo of the California bear; and a tattooed outline of California with a star in the Salinas area, which is the home of Nuestra Familia; "Delano" tattooed on his abdomen; a red "NKC" on his left shin area; and another "NKC" in black ink that appeared to be covered up.

Officer Santaella opined Carranco was an active member of the Northern criminal street gang on the date of the charged offenses. Officer Santaella found it significant Carranco was acting "in association" with another gang member, led police on a high-speed pursuit, and ultimately was taken into custody where two firearms were recovered from the vehicle. He also based his opinion in part on the fact the home of a dropout Northern gang member was targeted during one of the shootings.

Officer Santaella also discussed Madrigal's tattoos. He explained Madrigal's tattoo of a Huelga bird on his upper chest was consistent with "the cause of the Northern Structure and the Nuestra Raza" and symbolized Madrigal was "potentially an educator." Santaella explained Madrigal had a tattoo of "EBK" on his abdominal area, which stands for "every body killer." Madrigal also had the word "Delano" tattooed on his back. Santaella testified Norteños in Delano take specific pride in the fact they are from Delano. Madrigal also has "KC" tattooed on the back side of his head; "NKC" on his upper left arm; four dots on his left elbow; Aztec warrior art with four arrows on his right arm; a solid black five-pointed star on his right wrist called the "Northern Star"; and the letter "D" on his shin, which stands for Delano.

Officer Santaella opined Madrigal was an active member of the Norteño criminal street gang at the time of the charged offenses based upon the same facts Santaella considered in concluding Carranco was an active member of the Norteños at the time. Santaella also based his opinion on his review of police reports, his conversations with officers directly involved in those reports, his review of booking photos, and Madrigal's tattoos.

11.

Based on the facts presented in a hypothetical mirroring the facts of the two shootings in this case, Officer Santaella opined the crimes in the hypothetical were committed

> "in association with the Norteño criminal street gang based on the fact that two Norteño gang members are together at 2:30 a.m. in the morning and contact an individual on the street which ultimately ends up in a shooting where a vehicle is struck. Shortly thereafter the two individuals associating together go to a residence [where a known Norteño dropout was living] five days prior, ultimately shoot at the house and while leaving the area are involved in a high-speed pursuit with police. They are ultimately arrested, and firearms are located in the vehicle which one of those firearms is warm to the touch. So it is my opinion that these two individuals were in association together."

He also opined the crimes were committed for the benefit of the Norteño street gang. He explained the two Norteño gang members benefited from such crimes in that "[i]t allows for gang members to provide instant backup." He noted the gang members could also "vouch for each other to say that these crimes were committed and … they can be held accountable if they are questioned by fellow gang members." Additionally, he asserted the use of firearms by gang members garners respect and "instills fear into their own members of the gang and shows that these gang members are not afraid to use a firearm to attack individuals who are dropout gang members." Additionally, the fact these crimes were committed in the manner they were enhances the Norteño gang's reputation as a whole on the street.

On cross-examination, Officer Santaella confirmed it was his opinion, based on the facts of the case, that Daniel L., the dropout Norteño, was the intended victim of the College Drive shooting based on the fact he lived at the residence five days before the drive-by shooting. Officer Santaella did not know whether either defendant knew Daniel L. He testified it was a major violation for a Norteño to shoot at the residence of the family of an active gang member like Juan C.

12.

Carranco's counsel renewed her objection to Officer Santaella's entire testimony after he finished testifying. The court noted it deemed the objection continuing, and it overruled the objection.

*Predicate Offense Evidence*

Officer Antonio Alvarez was on patrol on September 26, 2014, at approximately 3:53 a.m. when he saw a pickup truck fail to stop at an intersection. He pulled over the truck and there were three people inside: the driver, Jerman Perez, the front passenger, Miguel Martinez, and the back right passenger, Alvaro Fernandez. They were all removed from the car and Officer Alvarez searched it. In the center console, he found a loaded .38 special revolver without a serial number and subsequently arrested the three occupants. Officer Santaella testified Jerman Perez was convicted of being a criminal street gang member in possession of a loaded firearm in violation of section 25850, subdivision (c)(3) and possession of a concealed firearm by a criminal street gang member in violation of section 25400, subdivision (c)(3) in connection with the incident. Officer Santaella was familiar with Jerman Perez and his tattoos, including the Mayan symbol on his right elbow area, consisting of four dots and two horizontal lines, a tattoo of "NKC," which stands for North Kern County, four dots on his left elbow area, and RIP Cruz on his right inner forearm.

Officer Alvarez was assigned to the gang unit on July 30, 2016, and conducted a traffic stop at around 9:22 p.m. after observing a car with a malfunctioning license plate lamp. Jorge Narvaez was the driver and Kristopher Hernandez was the front passenger. Alvarez knew Jorge Narvaez by the moniker, "June Bug." Officer Alvarez contacted both Jorge Narvaez and Hernandez and removed them from the car. Jorge Narvaez did not have a driver's license and was on probation, and Hernandez was on parole. Officer Alvarez searched the car and found a loaded .22-caliber revolver and methamphetamine in a hidden compartment in the glove box. Officer Santaella testified, in connection with the incident, Hernandez was convicted of possession of a firearm by a felon in violation

13.

of section 29800, subdivision (a)(1) and participation in a criminal street gang in violation of section 186.22, subdivision (a). Jorge Narvaez was convicted of possession of a controlled substance for sale in violation of Health and Safety Code section 11378 and participation in a criminal street gang in violation of Penal Code section 186.22, subdivision (a). Officer Santaella discussed Jorge Narvaez's tattoos, including an "old English D" that "is commonly known to Northern gang members from the city of Delano" and tattoos of dots on his hands equal to the number 14. Jorge Narvaez also had a tattoo of "661"—the area code for Kern County—with a "1" in front to total the number 14, and "RIP D Boys," which was paying respect to individuals from Delano who were killed. Based on his review of the police report, speaking to the lead investigating officer, reviewing the facts of the case, photographs of the tattoos and the items that were seized at the time of the investigation, Officer Santaella opined Hernandez and Jorge Narvaez were active Northern criminal street gang members at the time of this offense.

On March 1, 2017, Officer Santaella was on patrol when he saw Jose Narvaez. Officer Santaella attempted to make contact with Jose Narvaez, but Narvaez fled on foot. Officer Santaella pursued Jose Narvaez on foot and saw a silver firearm fall from his waistband. He ultimately took Jose Narvaez into custody and seized the firearm. During the course of his investigation, Santaella observed multiple Northern gang tattoos on Jose Narvaez and Santaella found "suspected methamphetamine" in his hat. Jose Narvaez also self-identified as a Norteño. In connection with the incident, Jose Narvaez was convicted of possession of a firearm by a felon in violation of section 29800, subdivision (a)(1) and he pled to participation in a criminal street gang in violation of section 186.22, subdivision (a). Officer Santaella opined, based on his training and experience and investigation of the case, that Jose Narvaez was an active member of the Norteño criminal street gang at the time of the offense. He testified possessing a firearm is one of the primary activities of the Norteño gang.

*Defense evidence*

The defense presented the testimony of Dr. Mitchell Eisen, an expert on memory, including eyewitness memory and suggestibility. He explained traumatic stress can keep people from processing elements of an experience as well as they normally would. He opined trauma does not improve memory. Rather, it hurts our recall for episodic details of a traumatic event because it causes us to be singularly focused on some elements of the trauma such that we do not take in the other information as well. He opined the presence of a weapon is disrupting for many people such that it keeps them from being able to process and consolidate the other details of the experience. In discussing memory with regard to recalling experience, Dr. Eisen explained scars, tattoos, unique piercings, and unique hairstyles are "[t]he distinctive stuff [that] tends to jump out at us more than the average, the mundane, common stuff." He explained if he introduced you to one person who is bald and one with long hair, "[y]ou may or may not be able to describe them or identify them later, but you'd probably get that much pretty consistently." He testified memory reports given closer in time to an incident when freshest in our mind tend to be the best snapshot of what we actually recall from an experience. When asked why someone who initially remembered the front passenger of a car was bald or balding would later change his memory a year and a half later to say the bald guy was in the back seat and the front passenger had hair and was not bald, Dr. Eisen responded there are a variety of reasons a person's memory might change over time, including the fact the person is more vulnerable to influence or accepts things without thinking them through. He declined to make specific comments on individuals but stated this type of movement is not unusual, "that people will come to embrace new details or be influenced by the suggestion of new details to consider."

Madrigal's counsel presented the testimony of Ace Pierce, a private investigator. Pierce explained he was retained to take photographs and measurements of the crime

15.

scene where Francisco B. was shot after dark. The photographs were introduced into evidence.

Carranco also called forensic science consultant Thomas Fedor. Fedor reviewed Carranco's DNA profile compared with the DNA profile obtained from the assault rifle. He pointed out what he deemed to be two "major difference[s]" in the profiles. He testified Madrigal had a "very interesting genotype" called a "tri-allele." He stated the prosecution's DNA analyst programmed TrueAllele, the DNA software program, not to evaluate Madrigal's tri-allele. He alleged this was a "glaring deviation" from the laboratory's protocol and meant the prosecution's DNA analyst "had her thumb on the scale when she was calculating TrueAllele." However, even then, the results were inconclusive. Fedor testified he believed the information related to the anomaly that was kept out of the specimen when it went through the TrueAllele program was exculpatory taken by itself.

*Rebuttal*

The prosecution's analyst Mandi Van Buren countered in rebuttal testimony that there was no broken policy or guideline in conducting her analysis. She explained, based on the technical review protocol at her laboratory, essentially three people are consulted about artifact peaks or a tri-allele. She stated she made a note of the peak related to the alleged tri-allele Fedor referred to, and she determined it was a "stutter." After a discussion with her DNA technical leader, they took the "most conservative" approach based on the laboratory's protocol by leaving that locus out of the analysis.

*Charges and motions to dismiss*

In connection with the shootings, defendants were charged with multiple counts of attempted murder with premeditation and deliberation (§§ 664, 187; counts 1, 4, 6, 8, 10 & 20), assault with a firearm (*id.*, § 245, subd. (a)(2); counts 2, 5, 7, 9 & 11), discharge of a firearm at an inhabited dwelling (*id.*, § 246; count 3), conspiracy to commit murder, assault with a firearm and/or shooting at an inhabited dwelling (*id.*, § 182, subd. (a)(1);

16.

count 12), gang conspiracy (*id.*, § 182.5; count 13), recklessly evading a pursuing officer in a motor vehicle (Veh. Code, § 2800.2; count 14), possession of an assault weapon (Pen. Code, § 30605; count 15), carrying a loaded firearm as a gang member (*id.*, § 25850, subd. (c)(3); count 16), and active participation in a criminal street gang (*id.*, § 186.22, subd. (a); count 17). Madrigal was also charged with being a felon in possession of a firearm. (§ 29800, subd. (a)(1); counts 18 & 19). As to every charge except counts 16 and 17, the offenses were alleged to have been committed for the benefit of, at the direction of, or in association with a criminal street gang. Each count also alleged firearm enhancements pursuant to sections 12021.5 and 12021.5, subdivision (b), and the attempted murder counts alleged firearm enhancements pursuant to section 12022.53, subdivisions (b), (c), and (e)(1). Carranco was also alleged to have personally used a firearm during the commission of count 2 pursuant to section 12022.5, subdivision (a). Madrigal was also alleged to have suffered one prison prior (§ 667.5, former subd. (b)); one strike prior (§§ 667, subds. (a)–(e), 1170.12), and one serious felony prior (§ 667, subd. (a)).

The court granted defendants' motion for entry of judgment of acquittal on four of the six attempted murder counts (counts 4, 6, 8, and 10), concluding the evidence was insufficient to support a jury determination that the only reasonable inference from the circumstance of the offense (the drive-by shooting) was that defendants intended to kill everyone in the zone of fatal harm as necessary to support a kill zone instruction. On the People's motion, the court also dismissed the section 12022.53, subdivisions (b) and (c) enhancement allegations in count 1 and the section 12022.5, subdivision (a) firearm enhancement allegation in count 2 as to Carranco. The court denied the defense motion for acquittal related to the gang enhancements attached to the assault with a firearm counts arising from the drive-by shooting (counts 5, 7, 9, 11), the charge for recklessly evading a police officer (count 14), and the charge for possession of an assault weapon (count 15). Madrigal's counsel also moved to dismiss count 14, for evading arrest,

17.

asserting his client was not driving the car at the time of the incident. The court took the matter under submission and denied the oral motion.

*Verdict*

The jury convicted Madrigal of shooting at an inhabited dwelling (§ 246; count 3); assault with a firearm (§ 245, subd. (a)(2); counts 5, 7, 9 & 11); gang conspiracy (§ 182.5; count 13); possession of an assault rifle (§ 30605; count 15); and possession of a firearm as a felon (counts 18 & 19). The jury found true the related gang and firearm enhancements (§§ 186.22, subd. (b)(1), 12021.5, 12021.5, subd. (b)). The jury also convicted Madrigal of carrying a loaded firearm in public as a gang member (§ 25850, subd. (c)(3); count 16) and active participation in a criminal street gang (§ 186.22, subd. (a); count 17), and found the related firearm enhancements true (§§ 12021.5, 12021.5, subd. (b)). The jury also convicted Madrigal of assault with a firearm (related to Francisco B.) (Pen. Code, § 245, subd. (a)(2); count 2) and reckless evasion of a peace officer (Veh. Code, § 2800.2; count 14), but found the related gang and firearm enhancements (Pen. Code, §§ 186.22, subd. (b)(1), 12021.5, 12021.5, subd. (b)) attached to those counts to be not true. The jury acquitted Madrigal of attempted murder of Francisco B. and Daniel L., as charged in counts 1 and 20, respectively, and of conspiracy as charged in count 12 (§ 182.5).

As with Madrigal, the jury found Carranco guilty of counts 2, 3, 5, 7, 9, 11, and 13 through 17. It found Carranco not guilty of counts 1, 12, and 20. The gang allegations were found true on counts 3, 5, 7, 9, 11, 13, and 15, but not true on counts 2 and 14. The gun allegations were found true on counts 3, 5, 7, 9, 11, 13, and 15 through 17, but not true on counts 2 and 14.

The court found true the prior offense allegations. It later dismissed the gang conspiracy conviction (count 13) as to both defendants and the prison prior allegations.

## DISCUSSION

### I. Evidence Was Sufficient to Support the Assault with a Firearm Against Francisco B. Convictions

Both defendants first contend the evidence was insufficient to support their assault with a firearm convictions as to Francisco B. (count 2). We disagree.

#### A. Standard of Review

On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055, cert. den. *sub nom. Lam Thanh Nguyen v. California* (2016) 136 S.Ct. 1714.) The reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value—upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

"The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) It is the jury, not the appellate court, which must be convinced of a defendant's guilt beyond a reasonable doubt. (*Ibid*.) "'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."'" (*Ibid*.)

We "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon

no hypothesis … is there sufficient substantial evidence to support'" the jury's verdict." (*People v. Zamudio*, *supra*, at p. 357.)

### B.    Analysis

Madrigal asserts the evidence implicating him in the Francisco B. shooting was "weak." He contends Francisco B. was the only witness to testify regarding the shooting and Francisco B. did not connect Madrigal to the crime; Francisco B. did not make an identification; and Francisco B.'s "description did not match Madrigal." Madrigal notes that Francisco B. consistently stated there were three people in a light colored or silver colored Grand Marquis, but defendants were detained in a Crown Victoria and there were only two occupants in the car, Carranco and Madrigal. He also asserts Francisco B. provided conflicting descriptions of the front seat passenger/shooter and did not recall any tattoos, though Madrigal has a tattoo on his face. He also argues there was no evidence to connect the firearms found in defendants' car to the Francisco B. shooting, and there was no evidence defendants knew Francisco B., had a "beef" with him, or had any motive to shoot at his car. Carranco joins and adopts by reference Madrigal's arguments, asserting "the evidence with respect to the issue of identity is indistinguishable as to each [defendant]."

""'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.'"'" (*People v Stanley* (1995) 10 Cal.4th 764, 793.) "''An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. [Citations.]'"'" (*People v. Solomon* (2010) 49 Cal.4th 792, 811–812.) "When, as here, the trier of fact has relied on inferences, those inferences must be reasonable. An inference is not reasonable if it is based only on speculation." (*People v. Holt* (1997) 15 Cal.4th 619, 669.)

Viewing the evidence in the light most favorable to the jury's verdict, as we must, we conclude sufficient circumstantial evidence, and the reasonable inferences that could be drawn therefrom, supports defendants' convictions for assault with a firearm on Francisco B. (count 2). Here, Francisco B. described the shooter and other occupants of the silver car as Hispanic males. He recalled the shooter discharged a black handgun, specifically a black revolver, in his direction. Officer Morales also testified Francisco B. specifically reported the gun was a black revolver. Approximately an hour after the shooting involving Francisco B., defendants were spotted driving nearby in a car resembling that described by Francisco B. Francisco B. described the car that approached him as a silver Grand Marquis and both Officer Morales and Francisco B. testified that a Crown Victoria and Grand Marquis were very similar in appearance. Indeed, Officer Morales testified he believed the silver Crown Victoria defendants were apprehended in was a Grand Marquis. There were not a lot of cars on the road at the time Officer Morales saw defendants' car, as it was 3:30 a.m. When Officer Morales attempted to pull the car over, it fled. Once the vehicle was stopped, two firearms were recovered from inside; one of the firearms was a black revolver. Carranco could not be excluded as a contributor to the DNA found on the black revolver. Additionally, Francisco B. explained the front passenger of the vehicle used a gang phrase, "What's up Ene?" when the car passed his. And there was strong evidence both Madrigal and Carranco were Norteño gang members at the time.

On this record, we cannot conclude "'"it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.) Rather, we conclude the jury could reasonably infer defendants were involved in the shooting of Francisco B. based upon the circumstantial evidence connecting them to the crime, including evidence of their gang ties, the use of a gang term during the offense, defendants' presence in a fleeing car that resembled that described by Francisco B. at 3:30 a.m. when few cars were on the road,

21.

nearby to the shooting of Francisco B., within an hour of the incident, and the presence in the car in which defendants were apprehended of a black revolver from which Carranco's DNA could not be excluded. (See generally *People v. Manibusan* (2013) 58 Cal.4th 40, 87 [in determining whether conviction is supported by sufficient evidence, reviewing court must accept all logical inferences that could be drawn from circumstantial evidence]; *In re James D.* (1981) 116 Cal.App.3d 810, 813 [substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom].) Defendants' connection to the subsequent nearby gang-related drive-by shooting also bolsters an inference that defendants were willing and motivated to commit a crime that night. That Francisco B. did not positively identify defendants as the perpetrators is not fatal to these convictions. (See *People v. Vargas* (2020) 9 Cal.5th 793, 824 ["What defendant manufactures is essentially a list of evidence that would buttress the prosecution's case. To treat this as dispositive would be to ignore the full range of evidence the jury actually considered"]; *People v. Mendez* (2010) 188 Cal.App.4th 47, 59 [concluding victims' failure to positively identify defendant in court was not fatal to true finding on firearm enhancement, noting "[w]eaknesses in the testimony of eyewitnesses are to be evaluated by the jury"].) Rather, for the reasons stated, we conclude sufficient evidence supports defendants' convictions on count 2.

## II. Admissibility of Evidence of Third Party Culpability

Defendants next argue the trial court abused its discretion in denying their motion to admit evidence to support a third party culpability defense, resulting in a violation of their rights to due process and to present a defense.

### A. Relevant Procedural History

Before trial, the prosecution moved to exclude, and Carranco's counsel moved to allow evidence of third party culpability related to Daniel L. In his related motion in limine and supplemental briefing, Carranco argued multiple residents of the house

believed Daniel L. committed the drive-by shooting. He asserted, L.G. reported she kicked Daniel L. out of the house a few days before the shooting because he stole her car and threatened to kill her. Another resident reported Daniel L. said he would "'merk [*sic*] the family.'" Carranco asserted Daniel L. had a motive to commit the charged crimes related to the shooting of the residence because he was recently kicked out, and Daniel L. stated he would kill the family just days before the shooting occurred.

The People argued such evidence was speculative and should be excluded pursuant to Evidence Code section 352, relying in part on *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*). They stated "evidence providing only a possible motive or opportunity to some third party is insufficient to raise a reasonable doubt of guilt and, thus, properly excluded under Evidence Code section 352." They also asserted there was no direct or circumstantial evidence linking Daniel L. to the shooting as required for the third party culpability evidence to be admissible.

The court excluded such evidence. It found evidence of any words spoken by Daniel L. to be hearsay. The court further found that "if the hearsay objections were sustained and the defense wished to provide evidence that there had been a problem in the house with Daniel L. and that the family had basically forced him to move out of the house and he was angry about it, without repeating the words he spoke, that that type of evidence would not be sufficient to raise … a reasonable doubt[,] that it would be speculation only. It would be evidence only of motive or opportunity and would be speculation." It was insufficient to trigger admissibility under *Hall*. The court exercised its discretion under Evidence Code section 352 in concluding the probative value of evidence there was a confrontation between Daniel L. and his family, the family kicked him out, Daniel L. was angry, and the family feared him, was outweighed by the "risk of undue confusion." The court also rejected the theory Daniel L.'s statements were admissible pursuant to Evidence Code section 1250 as nonhearsay on the issue of state of

23.

mind. The court concluded "the offers of proof would not satisfy admission under Evidence Code Section 1250."

After L.G. testified Daniel L. moved out of the house before the shooting, defense counsel asked the court to reconsider its prior evidentiary ruling and permit the defense to introduce evidence Daniel L. was kicked out and had threatened the family with retaliation days before the shooting. Counsel asserted the prosecutor had opened the door to such an inquiry. The court disagreed and reaffirmed its earlier decision to exclude the evidence on the grounds such evidence was irrelevant and unduly prejudicial under Evidence Code section 352.

Defense counsel again asked the court to reconsider its ruling after V.G. testified he did not know if Daniel L. was incarcerated after Daniel L. left the home. She argued evidence as to why Daniel L. left the residence had become "highly relevant and probative." The court did not find a basis to reconsider its prior ruling and again stated such evidence "would be unduly prejudicial under 352, and the prejudice would substantially outweigh the probative value."

## B. Standard of Review and Applicable Law

### 1. Admissibility of evidence of third party culpability

In *Hall*, *supra*, 41 Cal.3d 826, the California Supreme Court held that to be admissible, evidence of third party culpability must be capable of raising a reasonable doubt of the defendant's guilt. (*Id.* at p. 833; see *People v. Davis* (1995) 10 Cal.4th 463, 501.) This holding, "'did not, however, require the indiscriminate admission of any evidence offered to prove third-party culpability. The evidence must meet minimum standards of relevance: "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt; there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime."'" (*People v. McWhorter* (2009) 47 Cal.4th 318,

24.

368; see *People v. Edelbacher* (1989) 47 Cal.3d 983, 1017; accord, *Hall*, *supra*, at p. 833.) "'[I]n making these assessments, "courts should simply treat third-party culpability evidence *like any other evidence*: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion [citation]."'" (*People v. Prince* (2007) 40 Cal.4th 1179, 1242; accord, *People v. McWhorter*, *supra*, at p. 368 [third party culpability evidence "is subject to exclusion under Evidence Code section 352"].)

A trial court's ruling excluding third party culpability evidence is reviewed for an abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 581; *People v. Prince*, *supra*, 40 Cal.4th at p. 1242.)

### 2. *Defendant's constitutional right to present a defense*

While a defendant has a right to present a complete defense at trial, state evidentiary rules do not ordinarily infringe upon this right. Indeed, the United States Supreme Court has noted:

> "'[T]he Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense,"'" [citation], but we have also recognized that "'state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.'" [Citation]. Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." (*Nevada v. Jackson* (2013) 569 U.S. 505, 508.)

And "rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged" "are widely accepted" as not violating a defendant's constitutional right to present a defense. (*Holmes v. South Carolina* (2006) 547 U.S. 319, 327; accord, *Hall*, *supra*, 41 Cal.3d at pp. 834–835 ["As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.… [T]his principle applies perforce to evidence of third-party culpability"])

## C.   Analysis

Madrigal argues the court abused its discretion and violated his rights to due process, a fair trial, and to present a complete defense by precluding evidence that Daniel L. had been kicked out of the College Drive residence. He also challenges the exclusion of evidence Daniel L. had threatened his family in the weeks leading up to the shooting incident for which defendants were charged, while allowing the prosecution to present evidence Daniel L. was a gang dropout "to imply a motive for defendants to have committed the shooting." He asserts such third party culpability evidence was relevant to the defense theory that someone other than defendants committed the shooting. Alternatively, Madrigal states the excluded evidence would have raised a reasonable doubt as to whether Daniel L. was the shooter and "whether the shooting was related to a personal vendetta rather than gang related and/or assisting the criminal conduct of a gang member." He asserts the following "circumstantial evidence link[ed] [Daniel L.] to the crime": "evidence that [Daniel L.]'s family had thrown him out of the house and he made threats to kill them just days before the shooting," "evidence that three persons were in the car the prosecutor alleged was involved in both shootings, and [that] the DNA evidence reflected at least three contributors, with the analysis inconclusive as to both defendants." Additionally, he contends the testimony that Daniel L. had threatened to retaliate against his family members for kicking him out of the house was admissible under Evidence Code section 1250 as relevant to L.G.'s state of mind. He asserts the testimony that L.G. feared the shooting was gang related opened the door to permit the defense to question her regarding her fear of retaliation from her son after kicking him out. He also contends the probative value of evidence regarding the circumstances of Daniel L.'s departure from the house outweighed its prejudicial effect, particularly after evidence was introduced that Daniel L. was a gang dropout, he had previously lived at the College Drive house, and his family was in fear. Madrigal asserts it was "fundamentally unfair to allow the prosecutor to present a one-sided case to prove the

26.

defendants had a gang motive for the crime." He asserts the error in excluding the third party culpability evidence violated his constitutional rights and not only should be evaluated for prejudice under the standard set forth in *Chapman v. California* (1967) 386 US. 18, 24, but it was also prejudicial under the standard of review set forth in *People v. Watson* (1956) 46 Cal.2d 818, 837. Carranco joins in and incorporates by reference Madrigal's arguments.

The court did not abuse its discretion in excluding the proffered evidence. Here, the evidence regarding the circumstances surrounding Daniel L.'s departure from the College Drive house—that he was kicked out—related to a potential motive for Daniel L. to retaliate against his family. But evidence that Daniel L. had a motive to commit the shootings is insufficient on its own to warrant admissibility. (See *People v. McWhorter*, *supra*, 47 Cal.4th at p. 368; *People v. Edelbacher*, *supra*, 47 Cal.3d at p. 1017; accord *Hall*, *supra*, 41 Cal.3d at p. 833.) And, contrary to defendants' contentions, there was no other direct or circumstantial evidence connecting Daniel L. to the charged offenses. (See *People v. Prince*, *supra*, 40 Cal.4th at pp. 1239–1243 [court did not err in excluding evidence victim's boyfriend previously struck and threatened victim where the statements "did not directly or circumstantially connect" him to the actual commission of the crimes and "[t]he statements demonstrated no more than motive"]; accord, *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1137 [noting cases holding "mere evidence of third party's anger toward victim was insufficient," and "third party's possible motive alone insufficient to raise reasonable doubt of defendant's guilt"].) While it is true, as defendants contend, that Francisco B. reported there were three people in the shooter's car, and the DNA evidence retrieved from the weapons found in defendants' car reflected more than two contributors, such evidence did not directly or circumstantially connect Daniel L. to the charged crimes. Put differently, such evidence no more linked Daniel L. to the crime than it did any other third party. (See *People v. Turner* (2020) 10 Cal.5th 786, 816–817 ["admissible evidence of this nature points to the culpability of a *specific* third party, not

27.

the possibility that some unidentified third party could have committed the crime. [Citations.] For the evidence to be relevant and admissible, 'there must be *direct or circumstantial evidence linking the third person to the actual perpetration of the crime*'"]; *People v. Bracamontes* (2022) 12 Cal.5th 977, 999–1001 [affirming exclusion of third party culpability evidence where evidence showed mere motive or opportunity to commit the crime in another person but no evidence linked third party to commission of crime or to the three occupants allegedly seen parked in the cul-de-sac on night of victim's murder, noting "'[w]e have repeatedly upheld the exclusion of third party culpability evidence when the third party's link to a crime is tenuous or speculative'"].)

Additionally, we cannot conclude the court erred in concluding Daniel L.'s alleged threats against the family were inadmissible hearsay, not subject to an exception. That is, Daniel L.'s alleged threatening statement, made out of court, or evidence thereof "is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) In so concluding, we reject defendants' contention Daniel L.'s alleged threats were admissible pursuant to Evidence Code section 1250 as evidence of the state of mind of his family members, including L.G., in that they feared retaliation by him. "[T]hat exception applies only to statements offered to show the state of mind of the declarant, not the listener." (*People v. Luo* (2017) 16 Cal.App.5th 673, 677; accord, Evid. Code, § 1250, subd. (a)(1) ["evidence of a statement of the declarant's then existing state of mind … is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind"].) Thus, Madrigal incorrectly contends Daniel L.'s alleged statements were admissible as evidence of the state of mind of L.G. or the other occupants of the house. Furthermore, to the extent defendants sought to introduce evidence of other family members' out-of-court statements regarding what Daniel L. said to them, such statements are double hearsay. And "[m]ultiple hearsay may

not be admitted unless there is an exception for each level." (*People v. Sanchez* (2016) 63 Cal.4th 665, 675.)

Because the trial court did not err in applying the rules of evidence, we similarly reject Madrigal's claim he was denied his constitutional right to due process and to present a defense. (*People v. Prince*, *supra*, 40 Cal.4th at p. 1243 ["'[w]e … reject defendant's various claims that the trial court's exclusion of the proffered [third party culpability] evidence violated his federal constitutional right[] to present a defense …. There was no error under state law, and we have long observed that, "[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense"'"]; *People v. Robinson* (2005) 37 Cal.4th 592, 626–627 [same].)

## III.    Alleged Error in Admission of Gang Expert Testimony

Defendants next assert the court erred in permitting the gang expert to testify regarding matters beyond his expertise.

### A.    Relevant Factual and Procedural History

Before trial, the court held an Evidence Code section 402 hearing regarding the admissibility of testimony from Officer Santaella, a gang expert and percipient witness to case-specific facts related to the gang allegations against defendants. Officer Santaella testified regarding his gang-related training, including various courses he attended on prison gangs, street gangs, gang trends, gangs in the Central Valley area, and the operations of gangs. He testified one of the courses discussed Northern gang members, and he had the opportunity "to listen to a former Nuestra Familia member debrief for the class." He also discussed literature he had read on the topic of gangs, including *The History of Nuestra Familia* (2013) by Gabe Morales and *Nuestra Familia—A Broken Paradigm* (2012) by John "Boxer" Mendoza. He also discussed his experience and contacts with gangs. He explained the relationship between Nuestra Familia and

29.

Norteños: Nuestra Familia is a prison gang and the Norteños are considered to be "the street soldiers for the much larger prison gang." Officer Santaella discussed the relationship between leadership in the two organizations, stating:

> "The leadership consists of NF generals, lieutenants, and captains and down to a chain of command where there is what is referred to as a key holder for a particular area. Then there are what are called channels. Channels are the equivalent to a squad leader who oversee operations of gang activity, money collection, firearms distributions, things of that nature."

During trial, outside of the jury's presence, defense counsel objected to the PowerPoint presentation Officer Santaella planned to use "for demonstrative purposes only during his gang expert testimony." Specifically, defense counsel objected to three slides on the history of Nuestra Familia as hearsay, irrelevant, and unduly prejudicial under Evidence Code section 352. Defense counsel argued:

> "This is going into a detailed, in-depth history of Nuestra Familia that comes from essentially reading a book on the subject. This is not a Nuestra Familia case. This is a Norteños case. And while I realize that they are related, Nuestra Familia is more violent than a street gang because Nuestra Familia is a prison gang.
>
> "And so by bringing in all of this, all the probative value is outweighed by the unduly prejudicial nature by inferring that gangs are violent, terrible, terrible groups. And, therefore, essentially don't like the defendants is the way that it comes across. And I believe it's improper, and it's unnecessary, and I think it's going into way more depth and detail than case law allows in and that then [*sic*] is necessary in this particular case."

The prosecutor responded, multiple cases have held gang expert testimony on the history of a gang is permissible, asserting "there has to be some background so that the jury can understand what it means to be a member of a gang, what the organizational structure is like, where the gang may have originated." Defense counsel responded that she did not believe "that the history of the gang ha[d] to include all the incidents of past violence that this goes into in so much detail about."

The court took the matter under submission and found:

"[T]his is hearsay that the gang expert may rely upon. It is not case-specific. And … it is relevant to explain the history of the gang in terms of why gang members may follow certain rules and be willing to follow certain structures and orders from other people, including the theory of the People in this case that the crimes were committed to retaliate against a gang dropout. And I think this is all relevant to explain how that type of thing may happen. I don't find it's unduly prejudicial. The prejudicial effect does not substantially outweigh its probative value. So the hearsay, the 352, and other objections are overruled."

Defense counsel also objected to a slide in the presentation discussing one of the rules, or "bonds" of the Norteño gang as hearsay, irrelevant, and unduly prejudicial under Evidence Code section 352. The court took the matter under submission and overruled the objection, stating: "I am going to make a ruling for the same reasons I overruled the last objection. I do find it's relevant. The prejudicial effect does not substantially outweigh the probative value."

Defense counsel objected to subsequent presentation slides listing all 14 bonds of the Norteño gang, renewing the previous objections and arguing such slides were especially "unduly prejudicial" and "completely irrelevant for this case." The court overruled the objections, finding the evidence relevant and that the prejudicial effect did not substantially outweigh the probative value.

Before the slide presentation was shown to the jury during Officer Santaella's testimony, the court admonished the jury: "[T]he PowerPoint you are seeing displayed on the screen is not evidence. It's not something that you are going to have in the jury room. It's being allowed for demonstrative purposes only. You should rely upon the witness's testimony as the evidence."

Officer Santaella then testified regarding the history and origins of the Mexican Mafia and Nuestra Familia. He explained how the organizations were associated with the Norteños and the Sureños, specifically opining, "Foot soldiers for the Nuestra Familia are often known as Northerners or Norteños. Foot soldiers for the Mexican Mafia are often referred to as Sureños or Southerners." "The Northern Structure, Nuestra Raza, is [*sic*]

31.

the foot soldiers within the prison walls. And on the streets the Northerners or Norteños are the foot soldiers outside of the walls of prison." He explained when a member of the Nuestra Raza is released from prison, "they are given a position of authority to conduct business on behalf of the Northern Structure and the Nuestra Familia. And they are often referred to as a channel. They have what's called a chain of command similar to a military structure. And … they are given a role when they return to the streets, and they are to conduct themselves in a way that can further the cause and allow these Northern gang members to strive." He also detailed the hierarchy within Nuestra Familia. He discussed a document referred to as "the 14 Bonds" that was adopted as the rules and regulations and "put in place by the Northern Structure and the Nuestra Familia."

He explained Norteños and Sureños do not get along because of their origins, history, and beliefs. Norteños target Sureños and dropouts. He explained a dropout is considered a traitor. And, based upon the Norteño oath, a Norteno member called upon to attack a dropout gang member is obligated to carry out that assignment. Attacking a dropout gang member could be considered "putting in work," meaning committing crimes on behalf of the gang. "Putting in work" on behalf of the gang garners respect from fellow gang members and allows a member to be "recognized by senior Northern gang members as well as individuals who oversee gang operations."

He testified gang members will "street check," meaning they "will boast about their gang affiliation to individuals that they see either walking on the street, or if they come across another rival gang member they will typically shout out their gang's affiliation, whether it be verbally or … by displaying gang signs." He explained Norteños "street-check" nongang members also to determine whether an individual is gang-affiliated. Even if an individual is not gang related, the individual could still be assaulted.

Defense counsel for both defendants objected again to Officer Santaella's testimony on the history of the gang on relevancy grounds and as unduly prejudicial

under Evidence Code section 352. Carranco's counsel noted "it was over an hour's worth of testimony that was meant solely to inflame the jury and prejudice them against our clients." Madrigal's counsel argued the prosecutor "began with … the issues concerning the community leaders and the outrage that they have instilling fear in the citizens of Delano," which inflamed the passions of the jury under Evidence Code section 352. The court overruled the objections stating it did not "find that the evidence was unduly prejudicial under 352. It does not substantially outweigh its probative value. The community's reaction to gang activity or gang members' conduct is relevant in terms of understanding why people in the community might perceive gang members a certain way or be unwilling to cooperate with law enforcement or be witnesses. That's relevant in this case." The court noted there were "witnesses that were nervous about being here, and they talked about being uncomfortable being here and did not want to be here. And the gang history is consistent with the PowerPoint which [the court had] already ruled on." The court deemed the objections continuing and overruled them.

On cross-examination, in response to questions about the Nuestra Familia Constitution, Officer Santaella stated, "I am not a Nuestra Familia expert," noting he was there to testify on the Norteño criminal street gang, and he discussed the history of Nuestra Familia to lay a foundation for that testimony. He had an understanding of the Nuestra Familia, Northern Structure, and the Nuestra Raza as they apply to Norteño criminal street gangs. But he did not work in the prison setting and was not an expert "in the actual prison gang itself, just at the street level."

Carranco's counsel then moved to strike Officer Santaella's testimony in its entirety based on Santaella's representation he was not an expert on Nuestra Familia. Madrigal's counsel joined in the objection. Defense counsel argued, though Officer Santaella stated he did not have expertise on the larger gang, "the entirety for the most part of his direct was all about Nuestra Familia. And in the PowerPoint slide that he prepared he specifically wrote the Norteños subsets slash cliques are part of a larger

33.

common hierarchy and are governed by the laws of the larger gang." Counsel also argued:

> "I would also note that … he had numerous slides that we have gone through before on Nuestra Familia's history. He discussed the 1957 incident … and how Nuestra Familia … was formed and about an incident in 1965 and a group called La Familia started to form in Soledad prison. He talked about something that happened with Nuestra Familia in 1967.

> "He then went onto something in 1968. He talked about on September 13, 1968, how, in San Quentin, Hector Padilla confronted Robert Salas and that led to the shoe war. He talked about September 14, 1968, and another incident involving a knife or a shank. He talked about an incident from September 15, 1968. He talked about September 16 of 1968. He talked about how foot soldiers for Nuestra Familia are considered Norteños. And he talked about the feud between them.

> "He also discussed the five-point star, the Northern Star, and the CAUSE of Nuestra Familia and the meaning of 'CAUSE.' He additionally talked about the Norteños organizational structure which flows from Nuestra Familia and, again, about … the Bonds of the Nuestra Familia in much detail, including he also talked about the kite seized on April 22nd, 1999. He talked to Bond 4 of 14—[¶] … [¶] … He discussed … all of the Bonds of Nuestra Familia and even gave opinions on what they meant, despite the fact that they are the 14 Bonds of Nuestra Familia and he doesn't have that expertise.

> "He testified as to the oath that Nuestra Familia members have to take that is extremely prejudicial, and we have been through that already. Then he testified about La Lucha Del Norte, September 16, 1997. And that's where he said that the Norteño subsets and cliques are part of a larger common hierarchy and are governed by the larger gang. There are then four slides on the 14 Bonds … that relate to Nuestra Familia. He then tied Norteños directly to Nuestra Familia, which he doesn't have expertise with.

> "And I believe … his testimony should be stricken. And I'm also renewing my objection to all of the history slides on Nuestra Familia that we have previously litigated, now that we have learned the officer doesn't have that expertise. And I am asking, in the alternative, for the Court to strike all of the history."

The prosecutor responded, "Officer Santaella's discussion of the Nuestra Familia was part of the background to his expertise on the Norteños." He argued, "[T]here is no requirement that a person has to be an expert on every single conceivable subject that they are talking about. It's part of what makes him know more than the average person about the Norteños, which is why his opinion is helpful to the jury in this case." He argued defense counsel was "exaggerating the amount of time that was actually spent on the history," and it "was actually a very small portion of … direct [examination]."

The court denied the motion to strike, stating "I don't find there's been any prejudice that would substantially outweigh the probative value." The court explained:

> "I will find that the witness has the minimal qualifications necessary to render expert opinions with regard to the Norteños criminal street gang. His testimony relating to the Nuestra Familia, … he adequately explained that he has to have an understanding of that and the Northern Structure and the Nuestra Raza as it applies to the Norteño criminal street gangs.

> "He did testify that it's his opinion that the 14 Bonds do apply to the street level. And I understand the distinction he is making between asking him to render expert opinions about whether someone is a member of the Nuestra Familia versus someone being a member of the Norteños criminal street gang. It seems clear to me that he was trying to distinguish between the two and that he is here to express opinions about the Norteños criminal street gang, which is what the charges are based on."

## B.    Standard of Review and Applicable Law

Evidence Code section 720, subdivision (a) provides: "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." "The general test for the admissibility of expert testimony is the question of whether the testimony concerns a subject 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.'" (*People v. Johnson* (1993) 19 Cal.App.4th 778, 786–787, quoting Evid. Code, § 801, subd. (a); see *People v. Vang* (2011) 52 Cal.4th 1038, 1044.)

35.

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:

"(a) Related to a subject that is sufficiently beyond common experience that the opinion of an exert would assist the trier of fact; and

"(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801.)

Our Supreme Court has remarked that "'[w]hen expert opinion is offered, much must be left to the trial court's discretion.'" (*People v. Rodriguez* (2014) 58 Cal.4th 587, 639; see *People v. McDowell* (2012) 54 Cal.4th 395, 426 ["The trial court has broad discretion in deciding whether to admit or exclude expert testimony"].) Expert opinion testimony "'''will be excluded only when it would add *nothing at all* to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men [and women] of ordinary education could reach a conclusion as intelligently as the witness.'''''" (*People v. Edwards* (2013) 57 Cal.4th 658, 756.)

### C.    Analysis

Madrigal asserts the trial court abused its discretion and acted contrary to Evidence Code section 720, subdivision (a) by permitting Officer Santaella "to testify and present [P]ower[P]oint slides relaying extensive history of the overarching gang organization, including violence in the prison gangs and their control over the Norteño street gang, … to recite the Nuestra Raza oath, give his interpretation of the 14 bonds of the Nuestra Raza, and use that information to provide an opinion of motive for defendants to have committed a gang crime in shooting at the College Drive residence," given Officer Santaella's admitted lack of expertise regarding the Nuestra Familia and Nuestra Raza. He asserts the admission of such evidence violated his due process rights and right to a fair trial. He further contends the trial court abused its discretion in failing

36.

to exclude such evidence under Evidence Code section 352. He argues, without the extensive gang history and Santaella's erroneously admitted opinion that the "bonds" required a gang member to commit violence against a dropout, it was reasonably likely the gang enhancement allegations would have not been found true. Carranco joins in Madrigal's arguments. We cannot conclude the court abused its broad discretion in permitting the challenged testimony.

"'[E]xpert witnesses are given greater latitude' to testify regarding background information beyond matters within their personal knowledge because their testimony may 'provide specialized context the jury will need to resolve an issue.'" (*People v. Valencia* (2021) 11 Cal.5th 818, 835.) "'This latitude is a matter of practicality. A physician is not required to personally replicate all medical experiments dating back to the time of Galen in order to relate generally accepted medical knowledge that will assist the jury in deciding the case at hand. An expert's testimony as to information generally accepted in the expert's area, or supported by his own [personal] experience, may usually be admitted to provide specialized context the jury will need to resolve an issue.'" (*Id*. at p. 836.) "Hallmarks of background facts are that they are generally accepted by experts in their field of expertise, and that they will usually be applicable to all similar cases. Permitting experts to relate background hearsay information is analytically based on the safeguard of reliability. A level of reliability is provided when an expert lays foundation as to facts grounded in his or her expertise and generally accepted in that field." (*Ibid*.) Additionally, "[a] witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." (Evid. Code, § 802.)

Applying these principles here, we cannot conclude the trial court abused its discretion in admitting the challenged expert testimony. That is, we cannot conclude the

court erred in determining Officer Santaella's testimony related to Nuestra Familia, Nuestra Raza, and the Northern Structure was admissible as background information and that such evidence was relevant and admissible to give context to and provide a foundation for Officer Santaella's opinions in this case.

We also cannot conclude the court erred in determining any prejudice resulting from this testimony was not outweighed by its probative value. Officer Santaella's testimony about gang culture—particularly the view of dropouts, the expectations of gang members and their relationship to fellow gang members, the concept of "street checks," and the guiding principles of the gang—was highly relevant to defendants' possible motives for the charged crimes. (See *People v. Flores* (2020) 9 Cal.5th 371, 402 [any prejudice from gang expert testimony that "occasionally touched on inflammatory subjects" was far outweighed by its probative value as it was "highly relevant to defendant's possible motive for the charged crimes"].) And we cannot conclude the discussion of the history of the Norteño gang which, as discussed, provided context for Officer Santaella's expert opinions, was unduly inflammatory such that "its probative value [was] substantially outweighed by the probability that its admission [would] (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (See Evid. Code, § 352.) Accordingly, the court acted within its discretion in permitting the challenged testimony.

## IV. Alleged Prosecutorial Misconduct

Defendants next assert the prosecutor engaged in multiple instances of prejudicial misconduct during his rebuttal argument. They note defense counsel objected to the improper remarks and ultimately moved for a mistrial, but the court overruled the objections and denied the motion for mistrial. They argue the prejudicial misconduct violated their due process rights, rendering their trial fundamentally unfair. We address and reject each of these contentions in turn.

## A.    Standard of Review

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44; see *People v. Mendoza* (2007) 42 Cal.4th 686, 700; *People v. Farnam* (2002) 28 Cal.4th 107, 167.)  "The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor." (*People v. Mendoza*, *supra*, at p. 700.)  "'A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.'" (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

## B.    Alleged Misleading Remarks and Shifting of Burden

Defendants first assert the prosecutor shifted the burden of proof by suggesting the defense had the burden to produce evidence and by referencing the lack of evidence of third party culpability.

### 1.    *Relevant factual background*

During rebuttal argument, the prosecutor argued, "Perhaps [Officer Morales] could have done some additional investigation in this case.  Perhaps he could have tried to go back and look for [Francisco B.], try to get an identification."  But there was no evidence of an identification by Francisco B. and "we don't know what he would have done." The prosecutor continued:  "[E]ven at the defense's own argument, [Francisco B.] didn't get a good look at the person that shot at him.  And so even if Officer Morales had shown [Francisco B.] a six-pack then the defense would be arguing he obviously picked the wrong person out of that six-pack because he didn't get a good look."

The prosecutor then asserted he did not ask Francisco B. to identify the shooter in court as he did not believe such an identification would be reliable "[b]ecause it's been a year and a half since this happened. And the defense didn't ask him either. So what we have is what we have." Defense counsel objected, asserting the prosecutor was misstating the burden of proof. The court admonished the jury, "[T]he defense has no burden to prove anything." The prosecutor then continued, "They have no burden, but they can certainly ask questions." Defense counsel raised the same objection and the court stated, "Same admonition to the jury."

The prosecutor also argued: "We know that they didn't want to get caught because they were fleeing from the officers. They would toss the shell casings from the revolver, and they did that before they went to the house." Defense counsel objected that the prosecutor's remarks assumed facts not in evidence; the court overruled the objection.

Later, the prosecutor remarked:

"So the defense theory in this case basically is that someone else must have done the shootings. Right? It wasn't Mr. Madrigal. It wasn't Mr. Carranco. It must have been someone else. So let's go over the evidence that we have and that we don't have. This is just a comment on the state of the evidence. [¶] Was there any of [*sic*] evidence that the defendants are not Norteños? No. Was there evidence—"

Defense counsel objected, asserting the prosecutor was misstating the burden of proof. The court again admonished the jury that "the defense has no burden to prove anything" and the burden of proof was on the People. The prosecutor continued: "That's correct, ladies and gentlemen. I have the burden of proof in this case. But I am not the only person who can call witnesses. The defense can call witnesses."

Defense counsel again objected to burden shifting, and the court overruled the objection. The prosecutor continued:

"So this is just a commentary on the state of the evidence, ladies and gentlemen. [¶] Was there any evidence that there was another vehicle with a similar description out and about that night? No. [¶] Was there any

evidence that someone else committed these shootings? No. [¶] Was there any evidence that witnesses saw—"

Defense counsel objected as "[i]mproper comment based on the Court's previous rulings." The court sustained the objection and stated it would "strike the reference to evidence that someone else committed the shootings. That's stricken."

The prosecutor then continued:

"Well, again, ladies and gentlemen, you know what the evidence is, what we heard and what we did not hear. We also didn't hear that there were any shootings that occurred after the defendants were arrested in this case. [¶] So all of the evidence that we do have, all the evidence that you are required to consider because that's all that you are allowed to consider is the actual evidence that was presented in this case, points to the defendants."

### 2. *Analysis*

Defendants' argument first focuses on the prosecutor's comment regarding the lack of evidence of someone else committing the shootings. As Madrigal notes, the court sustained defense counsel's objection to the comment and struck the reference "to evidence that someone else committed the shootings."

It is settled that, while "[t]he prosecutor's argument cannot refer to the absence of evidence that only the defendant's testimony could provide," fair comment "on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses" is permitted. (*People v. Brady* (2010) 50 Cal.4th 547, 565–566; accord, *People v. Chatman* (2006) 38 Cal.4th 344, 407.) However, the prosecutor may not seek to mislead the jury by arguing a "'lack' of evidence where the defense was ready and willing to produce it," and would have done so but for an erroneous evidentiary ruling. (*People v. Varona* (1983) 143 Cal.App.3d 566, 570; see *People v. Daggett* (1990) 225 Cal.App.3d 751, 758 [prosecutor "unfairly took advantage" of an erroneous evidentiary ruling by arguing for "the jurors to draw an inference that they might not have drawn if they had heard the evidence the judge had excluded"].)

As discussed *ante*, it was not error for the court to exclude the proffered third party culpability evidence. Thus, this case did not involve an erroneous evidentiary ruling that the prosecutor took advantage of in closing argument. (See *People v. Lawley* (2002) 27 Cal.4th 102, 156 [distinguishing *People v. Varona* and *People v. Daggett* because these cases "involved erroneous evidentiary rulings on which the prosecutor improperly capitalized during his closing argument"].) Irrespective, here, the court struck the prosecutor's statement referring to the lack of evidence someone else committed the shooting, and we are not persuaded that the brief comment that was ordered stricken prejudiced the defendants. Rather, we presume the jury followed the court's instruction to "not … consider for any purpose evidence stricken by the court." (*People v. Schultz* (2020) 10 Cal.5th 623, 674 [noting defendant had not established prejudice from prosecutorial misconduct or error in denying mistrial motion on that basis where record did not "disclose any reason for [the] court to cast aside the presumption that the jurors followed the court's repeated admonishments" to disregard the improper evidence].)

We also cannot conclude the prosecutor's other challenged comments regarding the lack of certain evidence amounted to a misstatement of the burden of proof and prosecutorial misconduct. In *People v. Bradford* (1997) 15 Cal.4th 1229, the Supreme Court concluded the prosecutor did not commit misconduct during closing argument by making "brief comments" noting the absence of evidence contradicting the prosecution's evidence and the defense's failure to present material evidence or alibi witnesses. (*Id.* at p. 1339.) It rejected the defendant's argument the prosecutor's comments "impermissibly shift[ed] the burden of proof to defendant." (*Id.* at p. 1340.) Rather, it held "[a] distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*Ibid.*)

Here, the prosecutor argued there was a lack of evidence rebutting the evidence defendants were Norteño gang members, and there was no evidence additional shootings occurred after defendants were apprehended. The prosecutor also noted, though defense counsel highlighted Francisco B.'s failure to identify any suspects, defense counsel also did not ask Francisco B. whether he could identify the perpetrators. Notably, the prosecutor did not argue defendants had a burden to produce any evidence or to prove their innocence and, rather, reiterated the prosecution bore the burden of establishing defendants' guilt beyond a reasonable doubt. The brief comments referring to defendant's failure to introduce material evidence or to call logical witnesses was proper. (See *People v. Wash* (1993) 6 Cal.4th 215, 263 ["prosecutorial comment upon a defendant's failure 'to introduce material evidence or to call logical witnesses' is not improper"]; *People v. Ratliff* (1986) 41 Cal.3d 675, 691 [rule of *Griffin v. California* (1965) 380 U.S. 609 does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses].) As in *Bradford*, it did not impermissibly shift the burden of proof to defendants. (*People v. Bradford*, *supra*, 15 Cal.4th at p. 1340.) Rather, it was a fair comment on the state of the evidence. (See *People v. Sandoval* (2015) 62 Cal.4th 394, 439 ["'"It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom"'"].)

## C. Alleged Improper Vouching, Inflammatory Remarks, and Disparagement of Defense Counsel

The defendants next contend the prosecutor improperly vouched for the prosecution's witnesses, made comments that appealed to the jury's passions, and disparaged defense counsel during his rebuttal argument.

### 1. Relevant Factual Background

On the second day of the prosecutor's rebuttal, he began his argument by asserting:

> "[W]hen I got up here yesterday to start my rebuttal closing argument I've got to admit I was a little upset. I don't know if you could tell, but I was. And the reason why I was upset was because I had been listening for hours as the defense basically dragged Officer Morales and Officer Santaella through the mud, again and again. And, you know, that really kind of rubbed me the wrong way. These are officers who have chosen to do a job of protecting the community. They put their lives on the line—"

Defense counsel objected, asserting the prosecutor was "Vouching." The court admonished the jury: "Once again, what the attorneys are saying is not evidence. You will decide the credibility of witnesses. The attorneys can try to argue as to what you should find, but you are going to make the final decisions on credibility or any other issue." The prosecutor continued:

> "And this is just common sense, ladies and gentlemen. We know that they have a dangerous job. We know that they have taken violent criminals off the street. And we heard that's what they did on the day of this incident. They do the best they can, but they are not perfect. They are human. But because they are not perfect that must mean that they are liars. Because they are not perfect that must mean that they are unreliable or unqualified. [¶] Well, Officer Morales is the reason why two dangerous and violent criminals were arrested that day."

Defense counsel objected again that the argument was "[i]mproper." The court responded, "Same admonition to the jury." The prosecutor then argued:

> "These were the same two Norteños who had just gone to a house just minutes before and shot it up with an AK-47. They shot it up during the middle of the night, when there were eight people inside. This was a house that had two girls inside, [V.G.] being a U.S. veteran who served our country."

Defense counsel objected to the argument as improper. The court overruled the objection. The prosecutor continued:

44.

"And Officer Morales put two and two together. He was investigating these cases. He was vigilant, and he is the one who noticed the vehicle, the first officer to notice that vehicle. And he realized this vehicle must be involved. He followed it. He activated the lights and sirens. And the defendants fled because, the defendants, they don't care about the community."

Defense counsel again objected to the argument as improper. The court held a sidebar not reported and then told the prosecutor to continue. The prosecutor continued:

"[I]t was because of Officer Morales's vigilance that [defendants] were caught. That's why the Norteño criminal street gang has two less firearms at their disposal, one of them being an assault weapon."

Once again, defense counsel objected to the argument as improper. The court overruled the objection. The following exchange then took place:

"[PROSECUTOR]: But [Officer Morales] must be a liar because he made a couple of errors in his report. Well, let's contrast that with what we saw happen yesterday with closing arguments. [¶] It was actually [Madrigal's counsel] who tried to mislead you by inserting incorrect facts.

"[CARRANCO'S COUNSEL]: Objection. Improper.

"[MADRIGAL'S COUNSEL]: Objection. Improper.

"THE COURT: Sustained. Sustained.

"[CARRANCO'S COUNSEL]: Motion to strike.

"THE COURT: I am … going to strike the reference to counsel trying to mislead. Avoid that, Counsel.

"[PROSECUTOR]: We were here when we heard [Madrigal's counsel] state that the barrel of the rifle was scalding hot. Did we hear evidence that the barrel of the rifle was scalding hot? We did not. We heard that it was warm. Right? We heard that was in the report.

"[MADRIGAL'S COUNSEL]: To which I would object. It misstates counsel's argument.

"THE COURT: The jury will disregard any statements that don't reflect what actually was said. [¶] Continue."

The prosecutor later argued:

"[A]pparently finding out that [Officer Santaella] is not an expert on Nuestra Familia is somehow some sort of a Perry Mason moment? [¶] Perry Mason is—and I used to watch Perry Mason growing up. Before I went into the Marines I worked at UPS loading boxes, night shift. I'd come home at three or four o'clock in the morning—"

Defense counsel objected to the prosecutor's remarks as "improper." The court overruled the objection. The prosecutor asserted:

"Officer Santaella never passed himself off as a Nuestra Familia expert. That's not what he claimed. That's not what he said. He said he has an understanding. An understanding is what allows him to tell us about it. The law allows him to pass on information to help inform the jury, to give some background information. That's why he was allowed to testify to that. But somehow … because he admitted that he doesn't have an expertise in the Nuestra Familia but just an understanding that's a Perry Mason moment? No ladies and gentlemen."

At defense counsel's request, the court held an unreported sidebar during which defense counsel moved for a mistrial. The court denied the motion.

Carranco's counsel later explained on the record, the motion was based on "many improper statements made during the rebuttal," asserting "some of it even amounted to prosecutorial misconduct." Counsel asserted it was misconduct and improper for the prosecutor to state Madrigal's counsel was misleading. She asserted there were "instances of witness vouching for the officers by stating that they are people … who are risking their lives to do their job and essentially … they have no reason to lie." She also asserted "many comments that were made that were improper about personally attacking our clients, such as saying that our clients are two violent and dangerous criminals who do not care about the community." She also noted, after the motion for mistral was denied, the prosecutor stated there was no evidence anyone else had done the shooting. She asserted the reason there was no evidence another person had committed the shooting was because the court excluded the third party culpability evidence related to Daniel L. and, absent that ruling, there would have been that evidence. She argued, accordingly, it

was improper for the prosecutor "to then use the fact that there was no other evidence that anyone else did the shooting when there is some other evidence, arguably, and it just wasn't allowed to be brought in front of the jury. And it is improper burden shifting, as well, as were many of the other comments made during that time frame in his rebuttal."

Madrigal's counsel then emphasized the prosecutor's statement that he was misleading the jury was highly prejudicial and amounted to a disparaging attack on counsel that could affect how the jury views Madrigal in the case. He also asserted the prosecutor was "appealing to the passions of [the] jury" by mentioning one of the witnesses "served our country overseas in the Marine Corps." He also asserted the prosecutor personally attacked defendants in asserting they were violent and dangerous and had no concern for their community. He also argued numerous comments by the prosecutor regarding the lack of calling witnesses attempted to reduce the prosecutor's burden in this case.

The court reaffirmed its decision to deny the motion for mistrial. It noted it sustained defense counsel's objection to the prosecutor's statement that there was no evidence that someone else committed the shooting and struck the statement. It further reasoned it did not find any of the argument prejudiced defendants such that it would deny them a fair trial. The court stated it believed the prosecutor's arguments "were within the boundaries of permissible argument except to the extent that [the court] sustained objections and admonished the jury." The court stated it admonished the jury a number of times that "what the attorneys say is not evidence, that what they say is not the law. The jury is to decide the case based on the evidence and the law that [the court] gave to them." The court also noted, when the objection related to vouching was made, the court admonished the jurors "they are the ones who will decide whether witnesses are credible or not, to not rely upon counsel's argument in making those decisions." The court then stated, "[T]o the extent that there was any error, [the court was] satisfied that

[it] cured that with [the] admonitions to the jury. And there has been no miscarriage of justice, and that the defendants have not been denied a fair trial."

### 2. Analysis

### a. Discussion of role of police officer

In arguing the prosecutor improperly vouched for Officers Morales's and Santaella's credibility, defendants emphasize the prosecutor's comments that the officers have "chosen to do a job of protecting the community" and "[t]hey put their lives on the line." They also point to the prosecutor's reference to Officer Morales's "vigilance" and the prosecutor's following comments:

> "We know that [police officers] have a dangerous job. We know that they have taken violent criminals off the street. And we heard that's what they did on the day of this incident. They do the best they can, but they are not perfect. They are human. But because they are not perfect that must mean that they are liars. Because they are not perfect that must mean that they are unreliable or unqualified. [¶] Well, Officer Morales is the reason why two dangerous and violent criminals were arrested that day."

We cannot conclude the prosecutor's comments amounted to misconduct. A prosecutor may comment upon the credibility of witnesses based on facts contained in the record and any reasonable inferences that can be drawn from them, but may not vouch for the credibility of a witness based on personal belief or by referring to evidence outside the record. (*People v. Martinez* (2010) 47 Cal.4th 911, 958; *People v. Turner* (2004) 34 Cal.4th 406, 432–433.) Impermissible vouching of a witness may occur when a prosecutor places the government's prestige behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony. (See *People v. Linton* (2013) 56 Cal.4th 1146, 1207.)

Here, the challenged comments were based upon facts established by the officers' testimony regarding crimes they have investigated, including the charged offenses, and reasonable inferences that could be drawn therefrom. The prosecutor did not bolster the credibility of these witnesses based upon his personal beliefs or evidence outside of the

record.  Thus, we cannot conclude the prosecutor improperly vouched for Officer Morales's credibility.  (See *People v. Redd* (2010) 48 Cal.4th 691, 741 [prosecutor's comments that police officer was "'doing her job,'" "'[s]he's willing to put herself on the line,'" and another officer was "do[ing] [his] job[] properly," not improper vouching because it was based on facts established by testimony and did not refer to evidence outside record].)

Even if the prosecutor's statement that officers "put their lives on the line" could be deemed improper, we also cannot conclude defendants were prejudiced by that or the other brief comments in context.  Indeed, the prosecutor later acknowledged that police officers are human and sometimes make mistakes.  And the court repeatedly admonished the jury that what the attorneys say is not evidence and the jury is tasked with deciding the credibility of witnesses.  (See *People v. Edwards*, *supra*, 57 Cal.4th at p. 764 [presuming jury will follow instruction that statements of attorneys are not evidence]; *People v. Bryden* (1998) 63 Cal.App.4th 159, 184 ["Further, the court instructed the jury that questions and statements by the attorneys do not constitute evidence, and the jury is presumed to follow the court's instructions"].)  Defendants have provided no basis for us to conclude that these admonishments did not cure any alleged misconduct.

**b.      Prosecutor's reference to his prior service as a Marine**

It is generally misconduct for a prosecutor to refer to facts not in evidence during argument.  (See *People v. Hill* (1998) 17 Cal.4th 800, 827–828.)  Thus, here, the prosecutor's reference to the fact that he served in the Marine Corps was improper as it related a fact not in evidence.  However, we cannot conclude the brief reference to the prosecutor's military service constituted the "use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury," or that it resulted in a miscarriage of justice.  (*People v. Linton*, *supra*, 56 Cal.4th at p. 1205; see *People v. Barnett* (1998) 17 Cal.4th 1044, 1178, fn. 98 [noting prosecutor did not commit misconduct by referring

to his dishonorable discharge from the Army and displaying a Marine Corps K-bar knife].) We also cannot conclude it is reasonably probable the passing comment affected the jury's verdict. (See *People v. Velez* (1983) 144 Cal.App.3d 558, 569 [concluding it was unlikely defendant was prejudiced by prosecutor's brief reference to his personal military experience].)

### c. Other alleged inflammatory remarks

With regard to the prosecutor's reference to the defendants as "dangerous" and "violent" criminals who did not care about their community, we conclude these statements were not misconduct. "'"A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness"' [citation], and he may 'use appropriate epithets ....'" [Citations.]'" (*People v. Harrison* (2005) 35 Cal.4th 208, 244.)

Taken in context, the referenced statements were fair commentary on the state of the evidence and the inferences the jury could reasonably draw from the evidence and violent offenses of which defendants were ultimately convicted. Accordingly, we cannot conclude the challenged comments exceeded the permissible scope of argument. (See *People v. Stanley* (2006) 39 Cal.4th 913, 953 [finding prosecutor's description of defendant as "cold-blooded," "a person with no soul," and someone "with no remorse" was not misconduct given the brutal and violent nature of the crimes of which the defendant was convicted]; *People v. Harrison*, *supra*, 35 Cal.4th at pp. 244–246 [no misconduct where prosecutor referred to defendant as a "'prowler,'" an "'executioner,'" a "'head hunter,'" and "'the complete and total essence of evil'"].)

### d. Alleged disparagement of defense counsel

We also cannot conclude the prosecutor's comment that Madrigal's counsel "tried to mislead" the jury "by inserting incorrect facts" amounted to prejudicial misconduct. Although it is misconduct to attack the defendant's attorney personally (*People v. Hill*, *supra*, 17 Cal.4th at p. 832), including challenging the attorney's personal integrity (see

*People v. Bemore* (2000) 22 Cal.4th 809, 846), it is not misconduct to challenge "the persuasive force of defense counsel's closing argument." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1154–1155, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) And our Supreme Court has "found no impropriety" in prosecutorial remarks similar to those alleged here. (See *Zambrano*, *supra*, at p. 1155.) Such remarks include statements that a defense is "ridiculous" and "outrageous" (*People v. Stitely* (2005) 35 Cal.4th 514, 559–560), that defense counsel "was arguing out of both sides of his mouth" and that this was "'great lawyering'" (*People v. Gionis* (1995) 9 Cal.4th 1196, 1215–1216), and that defense counsel's job is to "'confuse[]'" and "'throw sand in your eyes,'" and counsel "'does a good job of it'" (*People v. Bell* (1989) 49 Cal.3d 502, 538). It has also been found acceptable to argue that defense counsel "'tried to smoke one past us'" (*People v. Huggins* (2006) 38 Cal.4th 175, 207), and to tell the jury to view the defense counsel's argument as a "'legal smoke screen'" (*People v. Stitely*, *supra*, at pp. 559–560).

As in those cases, with regard to the prosecutor's comment that Madrigal's counsel was "misleading" when he argued Officer Morales testified the barrel of the rifle was hot 30 minutes after the offense, "we see no improper attack on counsel's integrity, but only on the merits of his trial tactics and arguments." (*People v. Zambrano*, *supra*, 41 Cal.4th at p. 1155.) The challenged argument "did little more than urge the jury not to be influenced by [defense] counsel's arguments, and to instead focus on the testimony and evidence in the case." (*People v. Stanley*, *supra*, 39 Cal.4th at p. 952 [concluding prosecutor did not commit misconduct during guilt phase rebuttal argument when he told jury defense counsel "'imagined things that go beyond the evidence'" and told a "'bald-faced lie'"]; accord, *People v. Wiley* (1976) 57 Cal.App.3d 149, 162 [prosecutor's statements that defense counsel attempted to mislead victim during cross-examination was "simply an attempt to diminish the impact of defense counsel's cross-examination and [was] therefore within the range of proper comment"], disapproved of on other

grounds in *People v. Hayes* (1990) 52 Cal.3d 577, 628, fn. 10.) Accordingly, the prosecutor's comment did not constitute misconduct.

Moreover, we cannot conclude defendants were prejudiced by this passing comment. Given that this remark was a "small part of the prosecutor's very lengthy review of the evidence presented," it was "clearly recognizable as an advocate's hyperbole." (*People v. Sandoval* (1992) 4 Cal.4th 155, 184.) Moreover, the court sustained defense counsel's objections to the prosecutor's statement, ordered it stricken, and admonished the prosecutor to "[a]void that." We presume the jury followed the court's admonishment to disregard the comment.

### D. Cumulative Error

Madrigal argues the errors committed were cumulatively prejudicial and deprived him of a fair trial. Carranco joins and adopts Madrigal's argument. We disagree.

> "Under the 'cumulative error' doctrine, we reverse the judgment if there is a 'reasonable possibility' that the jury would have reached a result more favorable to defendant absent a combination of errors. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 646; *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 ['Under the "cumulative error" doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial.'].) 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."' (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)" (*People v. Poletti* (2015) 240 Cal.App.4th 1191, 1216–1217.)

Here, there is no series of prejudicial errors to cumulate. Accordingly, defendants cannot demonstrate the cumulative effect of the alleged errors resulted in prejudice. (See *In re Reno* (2012) 55 Cal.4th 428, 483 ["As noted, claims previously rejected on their substantive merits—i.e., this court found no legal error—cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate"].)

## V.     Assembly Bill 333

In supplemental briefing, defendants argue the criminal street gang enhancements, gang-related firearm enhancements, substantive convictions for active participation in a criminal street gang, and convictions for carrying a loaded firearm while a gang member must be reversed pursuant to changes made to section 186.22 by the enactment of Assembly Bill 333. They also contend newly enacted section 1109 (added by Stats. 2021, ch. 699, § 5) requires reversal and retrial of their other convictions in a bifurcated proceeding. We conclude defendants are entitled to reversal of the gang-related enhancements, substantive convictions for active participation in a criminal street gang, and convictions for carrying a loaded firearm while a gang member, which the People are entitled to retry under the amended law. We affirm defendants' other convictions.

### A.     Relevant Procedural History

Before trial, defendants moved to bifurcate all the gang charges and allegations. The court denied the motions.

### B.     Assembly Bill 333

While defendants' appeals were pending, the Legislature enacted Assembly Bill 333, the STEP Forward Act of 2021, which, in part, amends section 186.22 to impose new substantive and procedural requirements for gang enhancements. The legislation went into effect on January 1, 2022.

First, Assembly Bill 333 amended the definition of a "'criminal street gang,'" requiring proof that the gang is an ongoing, *organized* association or group of three or more persons, whose members *collectively* engage in, or have engaged in, a pattern of criminal activity (§ 186.22, subd. (f)). Next, the law created a stricter requirement for proof of "a pattern of criminal gang activity," which is necessary to prove that the group with which the defendant is associated is indeed a criminal street gang. (See § 186.22, subds. (e)–(f).) Previously, the prosecution needed to prove only that those associated with the gang had committed at least two offenses from a list of predicate crimes on

53.

separate occasions within three years of one another. (See former § 186.22, subd. (e).) Under the newly amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses. (§ 186.22, subd. (e)(2).) In addition, the last of the predicate offenses must have "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed." (§ 186.22, subd. (e)(1).) The predicate offenses must have been committed by two or more gang "members," and must have been for the "common[] benefit[] [of] a criminal street gang," and "the common benefit of the offense is more than reputational." (*Ibid.*) Assembly Bill 333 also narrowed the list of offenses that may be used to establish a pattern of criminal gang activity (compare former § 186.22, subd. (e)(1)–(33) with current § 186.22, subd. (e)(1)(A)–(Z)). Additionally, it defines "to benefit, promote, further, or assist" throughout section 186.22 to mean "to provide a common benefit to members of a gang where the common benefit is more than reputational." (*Id.*, subd. (g).) The legislation notes examples of a common benefit that are more than reputational "may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (*Ibid.*)

Finally, Assembly Bill 333 adds section 1109, which requires bifurcation of gang enhancements charged under section 186.22, subdivision (b) or (d) to be tried separately from the underlying charges upon request from the defense. (Stats. 2021, ch. 699, § 5.) Section 1109 also requires that the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)) be tried separately from all other counts that do not require gang evidence as an element of the crime (§ 1109, subd. (b)).

## C.     The Amendments to Section 186.22 Apply Retroactively

First, the parties agree Assembly Bill 333's amendments to section 186.22 altering the substantive requirements necessary to prove a gang enhancement operate

retroactively. Because the legislation increased the evidentiary burden necessary to prove a gang-related enhancement, we agree it was an ameliorative change in the law applying retroactively to cases not yet final on appeal.

And the California Supreme Court affirmed the parties' position in *People v. Tran* (2022) 13 Cal.5th 1169 (*Tran*).) The *Tran* court explained,

> "*Estrada* 'stand[s] for the proposition that (i) in the absence of a contrary indication of legislative intent, (ii) legislation that ameliorates punishment (iii) applies to all cases that are not yet final as of the legislation's effective date.' [Citation.] *Estrada* applies to statutory amendments 'which redefine, to the benefit of defendants, conduct subject to criminal sanctions.' [Citation.] Here, 'Assembly Bill 333 essentially adds new elements to the substantive offense and enhancements in section 186.22— for example, by requiring proof that gang members "collectively engage" in a pattern of criminal gang activity, that the predicate offenses were committed by gang members, that the predicate offenses benefitted the gang, and that the predicate and underlying offenses provided more than a reputational benefit to the gang ….' [Citations.] These changes have the effect of 'increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement,' with obvious benefit to defendants like Tran. [Citation.]" (*Id.* at pp. 1206–1207.)

### D. Defendants Are Entitled to Reversal of Their Substantive Gang Convictions, Convictions for Carrying a Firearm While an Active Gang Participant, and Gang-related Enhancements

In light of the changes to section 186.22, defendants assert they are entitled to reversal of their substantive gang-related convictions—carrying a loaded firearm while being a member of a criminal street gang (§ 25850, subd. (c)(3)) and active participation in a criminal street gang (§ 186.22, subd. (b)). Specifically, they assert the evidence failed to show the predicate offenses presented "commonly benefited the Norteño street gang in a manner that was more than reputational," as required by the amended statute. For these reasons, defendants contend the substantive gang offense, the count of carrying a loaded firearm, and the true findings on the gang and gun enhancements must be reversed. Alternatively, they assert it was federal constitutional error to instruct the jury

under the prior law and the substantive gang offense, the count of carrying a loaded firearm, and the true findings on the gang and gun enhancements must be reversed because the error was not harmless beyond a reasonable doubt.

The People concede there was insufficient evidence the alleged predicate offenses benefited the gang as required under the amended statute.[5] They argue "the case should be remanded to afford the prosecution an opportunity to retry the enhancements and the substantive gang crime and meet its burden of proof pursuant to AB 333's requirements." Specifically, they agree Officer Alvarez did not testify about how Jerman Perez's conduct on September 26, 2014, related to his convictions for being a criminal street gang member in possession of a loaded firearm and possession of a concealed firearm by a criminal street gang member, benefited the gang. There was also no testimony regarding how Kristopher Hernandez's conviction of possession of a firearm by a felon (§ 29800, subd. (a)(1)) and participation in a criminal street gang (§ 186.22, subd. (a)) and Jorge Narvaez's convictions for possession of a controlled substance (Health & Saf. Code, § 11378) and participation in a criminal street gang (§ 186.22, subd. (a)), related to their conduct on July 30, 2016, benefited a gang. There was also no testimony regarding how Jose Narvaez's conduct on March 1, 2017, resulting in convictions for possession of a firearm by a felon (§ 29800, subd. (a)(1)) and participation in a criminal street gang (§ 186.22, subd. (a)), benefited the gang.

We agree and, accordingly, accept the People's concession defendants are entitled to reversal of their convictions for active participation in a criminal street gang (§ 186.22, subd. (a)) and the section 186.22, subdivision (b) gang enhancements based on the changes to section 186.22. As the parties do not dispute, the evidence presented at trial

---

[5]In their subsequent supplemental briefing, the People argue "it appears that the March 2017 predicate commonly benefited the gang because it involved the substantive offense of participation in a criminal street gang and possession of a firearm by a felon, the latter of which is a primary activity of the gang …, [but] there is no evidence that the other two predicate offenses commonly benefited the gang."

was insufficient to establish "a pattern of criminal gang activity" under the revised statute—a necessary element of defendant's substantive gang conviction and enhancements. (See § 186.22, subds. (e), (f).) That is, there was insufficient evidence presented the predicate offenses commonly benefited a criminal street gang, and the common benefit from the offenses was more than reputational. (See § 186.22, subd. (e)(1); see also *People v. Lopez, supra*, 73 Cal.App.5th at p. 346 ["Although the People did submit evidence of two predicate offenses that were committed in the new time frame, the People did not prove that the predicate offenses commonly benefited a criminal street gang and that the benefit was more than reputational"].)

We also agree with defendants that they are entitled to reversal of their convictions for carrying a loaded firearm while an active gang participant in violation of section 25850, subdivision (c)(3) (count 16) because section 25850, subdivision (c)(3) expressly incorporates subdivision (a) of section 186.22. Specifically, defendants' convictions for a violation of section 25850, subdivision (c)(3) required a finding by the jury that "the person is an active participant in a criminal street gang, as defined in subdivision (a) of Section 186.22, under the Street Terrorism Enforcement and Prevention Act," which we have already concluded the evidence presented at trial was insufficient to prove. Thus, we reverse their convictions as to count 16. (See *People v. Lopez, supra*, 73 Cal.App.5th at p. 346 ["Assembly Bill 333's changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22"]; accord, *People v. Lopez* (2022) 82 Cal.App.5th 1, 25 [holding Assem. Bill 333's amendments to § 186.22, subds. (e) & (f) lawfully apply to § 182.5, which incorporates those sections]; *People v. Lee* (2022) 81 Cal.App.5th 232, 240 ["The express reliance by … the firearm enhancement statutes … on the definition of a criminal street gang in section 186.22 means that appellants are entitled to the benefit of this change in the law as to" those enhancements], review granted October 19, 2022, S275449.)

For the same reason, we conclude the sections 12021.5 and 12021.5, subdivision (b), firearm enhancements, which require a finding the person carried a loaded or unloaded firearm during the commission or attempted commission of a street gang crime as described in subdivision (a) or (b) of section 186.22, are also no longer supported. Accordingly, the imposed firearm enhancements must also be vacated.

However, we agree with the People that they are not foreclosed from retrying defendants on the substantive gang offense (§ 186.22, subd. (a)), for carrying a loaded firearm while an active gang member (§ 25850, subd. (c)(3)), the gang enhancements (§ 186.22, subd. (b)), and the gang-related firearm enhancements (§§ 12021.5, 12021.5, subd. (b)), upon remand under the new requirements of amended section 186.22. Put differently, "'[b]ecause we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial.'" (*People v. Sek* (2022) 74 Cal.App.5th 657, 669; accord, *People v. Figueroa* (1993) 20 Cal.App.4th 65, 72 ["Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence"]; see *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand"].)

### E.    The Failure to Bifurcate the Gang Allegations Was Harmless

Both defendants also argue newly enacted section 1109 applies retroactively to their cases and requires reversal and retrial of their underlying convictions. Defendants first argue the error in failing to bifurcate was structural and, thus, reversible per se, citing *People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274743, in support. Alternatively, they assert the error implicated constitutional concerns and

58.

resulted in a violation of due process. They argue the error was not harmless beyond a reasonable doubt under the standard for reviewing prejudice articulated in *Chapman v. California*, *supra*, 386 U.S. 18. Madrigal further contends the error was prejudicial even if it is reviewed for prejudice under the state law standard set forth in *People v. Watson*, *supra*, 46 Cal.2d 818, because it was reasonably probable he would have received a more favorable result but for the error. He asserts, "in light of the trial court's refusal to bifurcate the substantive gang charges and gang-related enhancements, the jury was exposed to extensive … gang evidence including the history of the Mexican Mafia, formation of various prison gang entities, with violent activities, to street gangs, that served no purpose in the trial other than to inflame the jury and prejudice the jurors against the defendants." He argues the gang evidence was "improperly used to create a motive to be relied on to infer guilt" and, without the gang evidence, there was "no substantial evidence to support a finding of guilt by Madrigal as to count 3 (§ 246) or connect him to the assault with a deadly weapon charges related to [the] College Drive" shooting. (Fn. omitted.) He asserts the People's claim the court would have admitted gang evidence in a trial on the underlying offenses is speculative and, even if some gang evidence would have been admitted, "it is inconceivable … anything like the evidence here would [have] be[en] admitted." Both defendants assert section 1109 should be read to require bifurcation of the section 182.5 gang conspiracy count, the count of carrying a loaded weapon while being an active gang member, and the gang-related firearm enhancements, though those offenses are not mentioned in section 1109. The People deny section 1109 should apply retroactively, asserting section 1109 is a procedural change and does not alter the substantive requirements of the gang allegations. Irrespective, they contend defendants are not entitled to reversal of their underlying convictions because they were not prejudiced by the failure to bifurcate the gang allegations under the standard articulated in *People v. Watson*, *supra*, 46 Cal.2d 818. They assert some of the gang evidence would have been admissible at a trial on the

underlying charges as relevant to motive.  They also contend evidence of defendants'
gang membership would have been admissible to prove the criminal gang conspiracy
count, the count of carrying a loaded weapon while being an active member of a criminal
street gang, and the gang-related firearm enhancements, noting none of these offenses are
listed in section 1109 as offenses or enhancements that must be bifurcated.  Here, we
agree with the People that the failure to bifurcate was harmless.  Accordingly, we affirm
the remaining convictions.

The courts of appeal are split on whether section 1109 applies retroactively.
(Compare *People v. Burgos*, *supra*, 77 Cal.App.5th at pp. 565–568 [holding § 1109
applies retroactively under *Estrada*], review granted, and *People v. Ramos* (2022) 77
Cal.App.5th 1116, 1128–1133 [same], with *People v. Ramirez* (2022) 79 Cal.App.5th 48,
65 [holding § 1109 is not retroactive], review granted Aug. 17, 2022, S275341, *People v.
Boukes* (2022) 83 Cal.App.5th 937, 948 [same] and *People v. Perez* (2022) 78
Cal.App.5th 192, 207 [same], review granted Aug. 17, 2022, S275090.)  Most recently, in
*Tran*, *supra*, 13 Cal.5th at page 1208, the California Supreme Court declined to resolve
the split, concluding any failure to bifurcate the gang allegations was harmless.  Notably,
whether section 1109 applies retroactively to nonfinal cases is an issue currently pending
before the California Supreme Court in *Burgos*.[6]

In reviewing for prejudice in *Tran*, the California Supreme Court concluded the
failure to bifurcate in that case did not render the trial fundamentally unfair such that it
required review under the standard for federal constitutional error articulated in *Chapman
v. California*, *supra*, 386 U.S. 18.  (*Tran*, *supra*, 13 Cal.5th at p. 1209.)  Accordingly, the

---

[6]The California Supreme Court granted review in *People v. Burgos*, *supra*, 77
Cal.App.5th 550 and initially deferred action pending consideration and disposition of *Tran*.
However, after issuing its opinion in *Tran*, the California Supreme Court issued a briefing order
in *Burgos* on October 12, 2022, directing the respondent to file an opening brief on the merits
limited to the following issue:  Does the provision of Penal Code section 1109 governing the
bifurcation at trial of gang enhancements from the substantive offense or offenses apply
retroactively to cases that are not yet final?

court considered whether the defendant was prejudice under the state law standard of review articulated in *People v. Watson*, *supra*, 46 Cal.2d 818 and concluded the defendant had failed to establish prejudice to his guilt verdicts. (*Tran*, at p. 1209.) In so holding, the *Tran* court also rejected the contention the failure to bifurcate as required under section 1109 constitutes structural error. (*Tran*, at p. 1208.)

Here, as in *Tran*, it is unnecessary to address the parties' claims regarding retroactivity because we conclude the failure to bifurcate the proceedings was harmless. In so holding, and for the reasons discussed further below, we cannot conclude the admission of the gang evidence rendered the trial "fundamentally unfair" such that it resulted in a due process violation and requires us to review for prejudice under the *Chapman* standard for constitutional error. (See *Tran*, *supra*, 13 Cal.5th at p. 1209.)

Applying the *Watson* standard for state law error, we cannot conclude it is reasonably probable defendants would have obtained a more favorable verdict in the absence of the gang evidence that would not have been presented had the gang enhancement and substantive gang offense been bifurcated. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) As discussed, Assembly Bill 333 amends section 186.22 and adds section 1109. (Stats. 2021, ch. 699, §§ 3–5.) Pursuant to section 1109, subdivision (a), "[i]f requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows: [¶] (1) The question of the defendant's guilt of the underlying offense shall be first determined. [¶] (2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement…." Section 1109, subdivision (b) provides that "[i]f a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the

61.

crime.  This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22."

Notably, as defendants acknowledge, here, defendants were charged with gang conspiracy (§ 182.5), carrying a loaded firearm while an active member of a criminal street gang (§ 25850, subd. (c)(3)), and gang-related firearm enhancements (§§ 12021.5, 12021.5, subd. (b)), which would necessarily require the introduction of much of the gang evidence, even in a bifurcated proceeding.  While defendants assert section 1109 also necessarily requires bifurcation of these allegations from the other charges, their argument is belied by the plain language of the statute.  Section 1109's plain terms only require bifurcation, upon request by the defense, of a gang enhancement charged under subdivision (b) or (d) of section 186.22 (§ 1109, subd. (a)), or "a violation of subdivision (a) of Section 186.22" (*id.*, subd. (b)).  Although sections 182.5, 25850, subdivision (c)(3), and 12021.5 specifically refer to provisions of section 186.22, section 1109 does not refer to any of these statutes.  Thus, on its face, section 1109 does not apply to violations of these sections.  (See *People v. Montano* (2022) 80 Cal.App.5th 82, 113–114 [noting the potential for "loophole[s]" to circumvent § 1109, but rejecting argument § 1109 applies to the determination of special circumstances under § 190.2, subd. (a)(22) reasoning, in part, "[d]efendants are asking us to rewrite section 1109 to expand the scope of its application, which would also require us to judicially amend multiple parts of a different statutory scheme" and "'[d]oing so would violate the cardinal rule that courts may not add provisions to a statute'"].)

Irrespective, nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges.  "The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.)  Gang evidence, "'including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the

62.

like[,] can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.'" (*Ibid.*, quoting *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Additionally, "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and … [a]n explanation of the basis for the witness's fear is likewise relevant to her credibility …." (*People v. Burgener* 2003) 29 Cal.4th 833, 869.)

And here, some of the gang evidence was relevant to motive in that the People's theory of the case was that defendants shot at the College Drive residence based on Daniel L.'s dropout status. Thus, evidence of defendants' gang affiliation and gang culture, particularly the view and treatment of dropouts and expectations of gang members, was relevant to the ultimate factual issues in the case. Francisco B. also asserted the shooter used a gang term before shooting at him, so evidence related to gang culture was relevant to put this statement in context. And evidence related to the use of "street checks" by gang members was also relevant to provide a motive for this shooting. Furthermore, the gang-related nature of the shooting at College Drive was also relevant to L.G.'s credibility and to help explain her denials at trial regarding her knowledge of her sons' gang affiliations in light of her earlier statements to police. Thus, even if section 1109 required bifurcation of the charges related to gang conspiracy, possession of a firearm by an active gang member, and the gang-related firearm enhancements, it is likely some, though not all, of the evidence of defendants' gang membership, the history of the gang, and gang culture would have come in at a trial on the other substantive offenses. (See *People v. Hernandez, supra*, 33 Cal.4th at pp. 1049–1050 ["To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary"]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 ["evidence related to gang membership is not insulated from the general rule that all relevant evidence is admissible

63.

if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative"].)

Furthermore, any inference of prejudice from the gang evidence is dispelled by the fact the jury acquitted defendants of multiple counts of attempted murder and found the gang-related enhancements not true with regard to certain charges and true as to others. It is apparent from this record the jury did not simply aggregate and rely upon the gang evidence to convict defendants of all the charged crimes and enhancements.

Additionally, the jury was given a limiting instruction regarding its consideration of the gang evidence, which we presume it followed. (See *People v. Franklin* (2016) 248 Cal.App.4th 938, 953 ["We presume that the jury followed these limiting instructions (regarding considering gang evidence for limited purpose), and there is nothing in this record to rebut that presumption"].) Consequently, on this record, we cannot conclude defendants were prejudiced by the failure to bifurcate the substantive gang offense and gang enhancement allegations from the other charges. (See *People v. Hernandez, supra*, 33 Cal.4th at p. 1051 ["Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendants' actual guilt"].) Thus, we affirm defendants' remaining convictions.

## DISPOSITION

The section 186.22, subdivision (b) gang enhancements and the section 12021.5 firearm enhancements are reversed. Defendants' substantive convictions for active participation in a criminal street gang (§ 186.22, subd. (a); count 17) and carrying a loaded firearm while an active gang member (§ 25850, subd. (c)(3); count 16), are also reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion. The People shall have 60 days from the date of the remittitur in which to file an election to retry defendants on these charges and enhancements. If the People elect not to retry them, the trial court shall modify the judgments by striking defendants'

64.

convictions for counts 16 and 17 (§§ 25850, subd. (c)(3), 186.22, subd. (a)) and the gang-related enhancements, and shall resentence defendants accordingly. Following the conclusion of proceedings, the court shall amend the abstracts of judgment in a manner consistent with this disposition and forward copies of the amended abstracts to the appropriate law enforcement and custodial officials. In all other respects, the judgments are affirmed.

PEÑA, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


DETJEN, J.